# JOHNSON *v.* TEXAS

No. 92–5653.   Argued April 26, 1993—Decided June 24, 1993

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, SCALIA, and THOMAS, JJ., joined. SCALIA, J., *post*, p. 373, and THOMAS, J., *post*, p. 374, filed concurring opinions. O'CONNOR, J., filed a dissenting opinion, in which BLACKMUN, STEVENS, and SOUTER, JJ., joined, *post*, p. 374.

*Michael E. Tigar* argued the cause for petitioner. With him on the briefs were *Robert C. Owen* and *Jeffrey J. Pokorak.*

*Dana E. Parker*, Assistant Attorney General of Texas, argued the cause for respondent. With her on the brief were *Dan Morales*, Attorney General, *Will Pryor*, First Assistant Attorney General, *Mary F. Keller*, Deputy Attorney General, and *Michael P. Hodge*, Assistant Attorney General.*

JUSTICE KENNEDY delivered the opinion of the Court.

For the second time this Term, we consider a constitutional challenge to the former Texas capital sentencing system. Like the condemned prisoner in *Graham* v. *Collins*, 506 U. S. 461 (1993), the petitioner here claims that the Texas special issues system in effect until 1991 did not allow his jury to give adequate mitigating effect to evidence of his youth. *Graham* was a federal habeas corpus proceeding where the petitioner had to confront the rule of *Teague* v. *Lane*, 489 U. S. 288 (1989), barring the application of new rules of law on federal habeas corpus. In part because the relief sought by Graham would have required a new rule within the meaning of *Teague*, we denied relief. The instant case comes to us on direct review of petitioner's conviction and sentence, so we consider it without the constraints of *Teague*, though of course with the customary respect for the

---

*\**Kent S. Scheidegger* filed a brief for the Criminal Justice Legal Foundation as *amicus curiae* urging affirmance.

doctrine of *stare decisis*. Based upon our precedents, including much of the reasoning in *Graham*, we find the Texas procedures as applied in this case were consistent with the Eighth and Fourteenth Amendments.

## I

Petitioner, then 19 years of age, and his companion, Amanda Miles, decided to rob Allsup's convenience store in Snyder, Texas, on March 23, 1986. After agreeing that there should be no witnesses to the crime, the pair went to the store to survey its layout and, in particular, to determine the number of employees working in the store that evening. They found that the only employee present during the predawn hours was a clerk, Jack Huddleston. Petitioner and Miles left the store to make their final plans.

They returned to Allsup's a short time later. Petitioner, a handgun in his pocket, reentered the store with Miles. After waiting for other customers to leave, petitioner asked Huddleston whether the store had any orange juice in one gallon plastic jugs because there were none on the shelves. Saying he would check, Huddleston went to the store's cooler. Petitioner followed Huddleston there, told Huddleston the store was being robbed, and ordered him to lie on the floor. After Huddleston complied with the order and placed his hands behind his head, petitioner shot him in the back of the neck, killing him. When petitioner emerged from the cooler, Miles had emptied the cash registers of about $160. They each grabbed a carton of cigarettes and fled.

In April 1986, a few weeks after this crime, petitioner was arrested for a subsequent robbery and attempted murder of a store clerk in Colorado City, Texas. He confessed to the murder of Jack Huddleston and the robbery of Allsup's and was tried and convicted of capital murder. The homicide qualified as a capital offense under Texas law because petitioner intentionally or knowingly caused Huddleston's death

and the murder was carried out in the course of committing a robbery. Tex. Penal Code Ann. §§ 19.02(a)(1), 19.03(a)(2) (1989).

After the jury determined that petitioner was guilty of capital murder, a separate punishment phase of the proceedings was conducted in which petitioner's sentence was determined. In conformity with the Texas capital sentencing statute then in effect, see Tex. Code Crim. Proc. Ann., Art. 37.071(b) (Vernon 1981),[1] the trial court instructed the jury that it was to answer two special issues:

> "[(1)] Was the conduct of the Defendant, Dorsie Lee Johnson, Jr., that caused the death of the deceased, committed deliberately and with the reasonable expectation that the death of the deceased or another would result?

> "[(2)] Is there a probability that the Defendant, Dorsie Lee Johnson, Jr., would commit criminal acts of violence that would constitute a continuing threat to society?"[2] App. 148–149.

The trial court made clear to the jury the consequences of its answers to the special issues:

> "You are further instructed that if the jury returns affirmative or 'yes' answer [sic] to all the Issues submitted, this Court shall sentence the Defendant to death. If the jury returns a negative or 'no' answer to any Issue submitted, the Court shall sentence the Defendant to life in prison." Id., at 146.

---

[1] The Texas Legislature amended the statute in 1991. See Art. 37.071(2) (Vernon Supp. 1992–1993).

[2] The statute also required that a third special issue, asking whether the defendant's act was "unreasonable in response to the provocation, if any, by the deceased," be submitted to the jury "if raised by the evidence." Art. 37.071(b)(3) (Vernon 1981). Petitioner does not contest the trial court's decision not to submit the third special issue in this case.

The jury was instructed not to consider or discuss the possibility of parole. *Id.*, at 147. The trial court also instructed the jury as follows concerning its consideration of mitigating evidence:

> "In determining each of these Issues, you may take into consideration all the evidence submitted to you in the trial of this case, whether aggravating or mitigating in nature, that is, all the evidence in the first part of the trial when you were called upon to determine the guilt or innocence of the Defendant and all the evidence, if any, in the second part of the trial wherein you are called upon to determine the answers to the Special Issues." *Ibid.*

Although petitioner's counsel filed various objections to the jury charge, there was no request that a more expansive instruction be given concerning any particular mitigating circumstance, including petitioner's youth.

In anticipation of the trial court's instructions, the State during the punishment phase of the proceedings presented numerous witnesses who testified to petitioner's violent tendencies. The most serious evidence related to the April convenience store robbery in Colorado City. Witnesses testified that petitioner had shot that store clerk in the face, resulting in the victim's permanent disfigurement and brain damage. Other witnesses testified that petitioner had fired two shots at a man outside a restaurant in Snyder only six days after the murder of Huddleston, and a sheriff's deputy who worked in the jail where petitioner was being held testified that petitioner had threatened to "get" the deputy when he got out of jail.

Petitioner's acts of violence were not limited to strangers. A longtime friend of petitioner, Beverly Johnson, testified that in early 1986 petitioner had hit her, thrown a large rock at her head, and pointed a gun at her on several occasions. Petitioner's girlfriend, Paula Williams, reported that, after

petitioner had become angry with her one afternoon in 1986, he threatened her with an axe. There were other incidents, of less gravity, before 1986. One of petitioner's classmates testified that petitioner cut him with a piece of glass while they were in the seventh grade. Another classmate testified that petitioner also cut him with glass just a year later, and there was additional evidence presented that petitioner had stabbed a third classmate with a pencil.

The State established that the crimes committed in 1986 were not petitioner's first experience with the criminal justice system. Petitioner had been convicted in 1985 of a store burglary in Waco, Texas. Petitioner twice violated the terms of probation for that offense by smoking marijuana. Petitioner was still on probation when he committed the Huddleston murder.

The defense presented petitioner's father, Dorsie Johnson, Sr., as its only witness. The elder Johnson attributed his son's criminal activities to his drug use and his youth. When asked by defense counsel whether his son at the age of 19 was "a real mature person," petitioner's father answered:

> "No, no. Age of nineteen? No, sir. That, also, I find to be a foolish age. That's a foolish age. They tend to want to be macho, built-up, trying to step into manhood. You're not mature-lized for it." *Id.*, at 27.

At the close of his testimony, Johnson summarized the role that he thought youth had played in his son's crime:

> "[A]ll I can say is I still think that a kid eighteen or nineteen years old has an undeveloped mind, undeveloped sense of assembling not—I don't say what is right or wrong, but the evaluation of it, how much, you know, that might be—well, he just don't—he just don't evaluate what is worth—what's worth and what's isn't like he should like a thirty or thirty-five year old man would. He would take under consideration a lot of things that a younger person that age wouldn't." *Id.*, at 47.

The father also testified that his son had been a regular churchgoer and his problems were attributable in large part to the death of his mother following a stroke in 1984 and the murder of his sister in 1985. Finally, the senior Johnson testified to his son's remorse over the killing of Huddleston.

At the voir dire phase of the proceedings, during which more than 90 prospective jurors were questioned over the course of 15 days, petitioner's counsel asked the venirepersons whether they believed that people were capable of change and whether the venirepersons had ever done things as youths that they would not do now. See, e. g., Tr. of Voir Dire in No. 5575 (132d Jud. Dist. Ct., Scurry County, Tex.), pp. 1526–1529 (Juror Swigert); id., at 1691–1692 (Juror Freeman); id., at 2366 (Juror Witte); id., at 2630–2632 (Juror Raborn).[3] Petitioner's counsel returned to this theme in his closing argument:

> "The question—the real question, I think, is whether you believe that there is a possibility that he can change. You will remember that that was one thing every one of you told me you agreed—every one of you agreed with me that people can change. If you agree that people can change, then that means that Dorsie can change and that takes question two [regarding future dangerousness] out of the realm of probability and into possibility,

---

[3] The colloquy on this point between petitioner's counsel and Juror Raborn is illustrative of the discussions had with the other jurors:

"Q. Okay. Do you feel that—let me ask you this. Do you feel a person who is—or a young person will do things that they will not do in later years, thirty or forty—

"A. I believe that.

"Q. Do you believe that people can change?

"A. Yes, I believe they can. I've known some that have.

"Q. Do you think that the way a person acts in the present or the past or how he has acted in the past is an absolute indicator of what he will do in the future, thirty or forty years down the road?

"A. No, not on down the line. Like I say, you can change." Tr. of Voir Dire, at 2630–2631.

you see, because if he can change, then it is no longer probable that he will do these things, but only possible that he can and will do these things, you see.

"If people couldn't change, if you could say I know people cannot change, then you could say probably. But every one of you knows in your heart and in your mind that people can and people do change and Dorsie Johnson can change and, therefore, the answer to question two should be no." App. 81.

Counsel also urged the jury to remember the testimony of petitioner's father. *Id.*, at 73–74.

The jury was instructed that the State bore the burden of proving each special issue beyond a reasonable doubt. *Id.*, at 145. A unanimous jury found that the answer to both special issues was yes, and the trial court sentenced petitioner to death, as required by law. Tex. Code Crim. Proc. Ann., Art. 37.071(e) (Vernon 1981).

On appeal, the Texas Court of Criminal Appeals affirmed the conviction and sentence after rejecting petitioner's seven allegations of error, none of which involved a challenge to the punishment-phase jury instructions. 773 S. W. 2d 322 (1989). Five days after that state court ruling, we issued our opinion in *Penry* v. *Lynaugh,* 492 U. S. 302 (1989). Petitioner filed a motion for rehearing in the Texas Court of Criminal Appeals arguing, among other points, that the special issues did not allow for adequate consideration of his youth. Citing *Penry,* petitioner claimed that a separate instruction should have been given that would have allowed the jury to consider petitioner's age as a mitigating factor. Although petitioner had not requested such an instruction at trial and had not argued the point prior to the rehearing stage on appeal, no procedural bar was interposed. Instead, the Court of Criminal Appeals considered the argument on the merits and rejected it. After noting that it had already indicated in *Lackey* v. *State,* 819 S. W. 2d 111, 134 (Tex. Crim. App. 1989), that youth was relevant to the jury's consider-

ation of the second special issue, the court reasoned that "[i]f a juror believed that [petitioner's] violent actions were a result of his youth, that same juror would naturally believe that [petitioner] would cease to behave violently as he grew older." App. 180. The court concluded that "the jury was able to express a reasoned moral response to [petitioner's] mitigating evidence within the scope of the art. 37.071 instructions given to them by the trial court." *Id.*, at 180–181.

Petitioner filed a petition for certiorari, which we granted. 506 U. S. 1090 (1993).

## II

### A

This is the latest in a series of decisions in which the Court has explained the requirements imposed by the Eighth and Fourteenth Amendments regarding consideration of mitigating circumstances by sentencers in capital cases. The earliest case in the decisional line is *Furman* v. *Georgia*, 408 U. S. 238 (1972). At the time of *Furman*, sentencing juries had almost complete discretion in determining whether a given defendant would be sentenced to death, resulting in a system in which there was "no meaningful basis for distinguishing the few cases in which [death was] imposed from the many cases in which it [was] not." *Id.*, at 313 (WHITE, J., concurring). Although no two Justices could agree on a single rationale, a majority of the Court in *Furman* concluded that this system was "cruel and unusual" within the meaning of the Eighth Amendment. The guiding principle that emerged from *Furman* was that States were required to channel the discretion of sentencing juries in order to avoid a system in which the death penalty would be imposed in a "wanto[n]" and "freakis[h]" manner. *Id.*, at 310 (Stewart, J., concurring).

Four Terms after *Furman*, we decided five cases, in opinions issued on the same day, concerning the constitutionality of various capital sentencing systems. *Gregg* v. *Georgia*,

428 U. S. 153 (1976); *Proffitt* v. *Florida,* 428 U. S. 242 (1976); *Jurek* v. *Texas,* 428 U. S. 262 (1976); *Woodson* v. *North Carolina,* 428 U. S. 280 (1976); *Roberts* v. *Louisiana,* 428 U. S. 325 (1976). In the wake of *Furman,* at least 35 States had abandoned sentencing schemes that vested complete discretion in juries in favor of systems that either (i) "specif[ied] the factors to be weighed and the procedures to be followed in deciding when to impose a capital sentence," or (ii) "ma[de] the death penalty mandatory for certain crimes." *Gregg, supra,* at 179–180 (opinion of Stewart, Powell, and STEVENS, JJ.). In the five cases, the controlling joint opinion of three Justices reaffirmed the principle of *Furman* that "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U. S., at 189; accord, *Proffitt, supra,* at 258 (opinion of Stewart, Powell, and STEVENS, JJ.).

Based upon this principle, it might have been thought that statutes mandating imposition of the death penalty if a defendant was found guilty of certain crimes would be consistent with the Constitution. But the joint opinions of Justices Stewart, Powell, and STEVENS indicated that there was a second principle, in some tension with the first, to be considered in assessing the constitutionality of a capital sentencing scheme. According to the three Justices, "consideration of the character and record of the individual offender and the circumstances of the particular offense [is] a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson, supra,* at 304 (plurality opinion); accord, *Gregg, supra,* at 189–190, n. 38 (opinion of Stewart, Powell, and STEVENS, JJ.); *Jurek, supra,* at 273–274 (opinion of Stewart, Powell, and STEVENS, JJ.); *Roberts, supra,* at 333 (plurality opinion of Stewart, Powell, and STEVENS, JJ.). Based upon this second principle, the Court struck down mandatory imposition of the death penalty for specified crimes as inconsistent with the requirements of the Eighth and Fourteenth

Amendments. See *Woodson, supra,* at 305; *Roberts, supra,* at 335–336.

Two Terms later, a plurality of the Court in *Lockett* v. *Ohio,* 438 U. S. 586 (1978), refined the requirements related to the consideration of mitigating evidence by a capital sentencer. Unlike the mandatory schemes struck down in *Woodson* and *Roberts* in which all mitigating evidence was excluded, the Ohio system at issue in *Lockett* permitted a limited range of mitigating circumstances to be considered by the sentencer.[4] The plurality nonetheless found this system to be unconstitutional, holding that "the Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U. S., at 604. A majority of the Court adopted the *Lockett* rule in *Eddings* v. *Oklahoma,* 455 U. S. 104 (1982); accord, *Hitchcock* v. *Dugger,* 481 U. S. 393, 398–399 (1987); *Skipper* v. *South Carolina,* 476 U. S. 1, 4 (1986), and we have not altered the rule's central requirement. "*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be part of the sentencing decision at all." *McKoy* v. *North Carolina,* 494 U. S. 433, 456 (1990) (KENNEDY, J., concurring

---

[4] Once an Ohio defendant was found guilty of aggravated murder involving at least one of seven aggravating circumstances, the judge was required to sentence the defendant to death unless at least one of three mitigating circumstances was present: (1) the victim induced or facilitated the offense; (2) it is unlikely the crime would have been committed but for the fact that the defendant was acting under duress, coercion, or strong provocation; or (3) the offense was primarily the product of the defendant's psychosis or mental deficiency. See *Lockett,* 438 U. S., at 607–608.

in judgment); see also *Graham*, 506 U. S., at 475; *Saffle* v. *Parks*, 494 U. S. 484, 490–491 (1990).

Although *Lockett* and *Eddings* prevent a State from placing relevant mitigating evidence "beyond the effective reach of the sentencer," *Graham, supra*, at 475, those cases and others in that decisional line do not bar a State from guiding the sentencer's consideration of mitigating evidence. Indeed, we have held that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty,'" *Boyde* v. *California*, 494 U. S. 370, 377 (1990) (quoting *Franklin* v. *Lynaugh*, 487 U. S. 164, 181 (1988) (plurality opinion)); see also *Saffle, supra*, at 490.

B

The Texas law under which petitioner was sentenced has been the principal concern of four previous opinions in our Court. See *Jurek* v. *Texas, supra; Franklin* v. *Lynaugh, supra; Penry* v. *Lynaugh*, 492 U. S. 302 (1989); *Graham, supra*. As we have mentioned, *Jurek* was included in the group of five cases addressing the post-*Furman* statutes in 1976.

In *Jurek*, the joint opinion of Justices Stewart, Powell, and STEVENS first noted that there was no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment, the statute having adopted five different classifications of murder for that purpose. See *Jurek*, 428 U. S., at 270–271. Turning to the mitigation side of the sentencing system, the three Justices said: "[T]he constitutionality of the Texas procedures turns on whether the enumerated [special issues] allow consideration of particularized mitigating factors." *Id.*, at 272. In assessing the constitutionality of the mitigation side of this scheme, the three Justices examined in detail only the second special issue, which asks whether "'there is a probability that the defend-

ant would commit criminal acts of violence that would constitute a continuing threat to society.'" Although the statute did not define these terms, the joint opinion noted that the Texas Court of Criminal Appeals had indicated that it would interpret the question in a manner that allowed the defendant to bring all relevant mitigating evidence to the jury's attention:

> "'In determining the likelihood that the defendant would be a continuing threat to society, the jury could consider whether the defendant had a significant criminal record. It could consider the range and severity of his prior criminal conduct. It could further look to the age of the defendant and whether or not at the time of the commission of the offense he was acting under duress or under the domination of another. It could also consider whether the defendant was under an extreme form of mental or emotional pressure, something less, perhaps, than insanity, but more than the emotions of the average man, however inflamed, could withstand.' [*Jurek* v. *State*,] 522 S. W. 2d [934], 939–940 [(Tex. Crim. App. 1975)]." *Id.*, at 272–273.

The joint opinion determined that the Texas system satisfied the requirements of the Eighth and Fourteenth Amendments concerning the consideration of mitigating evidence: "By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function." *Id.*, at 276. Three other Justices agreed that the Texas system satisfied constitutional requirements. See *id.*, at 277 (WHITE, J., concurring in judgment).

We next considered a constitutional challenge involving the Texas special issues in *Franklin* v. *Lynaugh, supra.* Although the defendant in that case recognized that we had

upheld the constitutionality of the Texas system as a general matter in *Jurek*, he claimed that the special issues did not allow the jury to give adequate weight to his mitigating evidence concerning his good prison disciplinary record and that the jury, therefore, should have been instructed that it could consider this mitigating evidence independent of the special issues. 487 U. S., at 171–172. A plurality of the Court rejected the defendant's claim, holding that the second special issue provided an adequate vehicle for consideration of the defendant's prison record as it bore on his character. *Id.*, at 178. The plurality also noted that *Jurek* foreclosed the defendant's argument that the jury was still entitled to cast an "independent" vote against the death penalty even if it answered yes to the special issues. 487 U. S., at 180. The plurality concluded that, with its special issues system, Texas had guided the jury's consideration of mitigating evidence while still providing for sufficient jury discretion. See *id.*, at 182. Although JUSTICE O'CONNOR expressed reservations about the Texas scheme for other cases, she agreed that the special issues had not inhibited the jury's consideration of the defendant's mitigating evidence in that case. See *id.*, at 183–186 (opinion concurring in judgment).

The third case in which we considered the Texas statute is the pivotal one from petitioner's point of view, for there we set aside a capital sentence because the Texas special issues did not allow for sufficient consideration of the defendant's mitigating evidence. *Penry* v. *Lynaugh, supra.* In *Penry*, the condemned prisoner had presented mitigating evidence of his mental retardation and childhood abuse. We agreed that the jury instructions were too limited for the appropriate consideration of this mitigating evidence in light of Penry's particular circumstances. We noted that "[t]he jury was never instructed that it could consider the evidence offered by Penry as *mitigating* evidence and that it could give mitigating effect to that evidence in imposing sentence." 492 U. S., at 320. Absent any definition for the term "delib-

erately," we could not "be sure that the jury was able to give effect to the mitigating evidence . . . in answering the first special issue," *id.*, at 323, so we turned to the second special issue, future dangerousness. The evidence in the case suggested that Penry's mental retardation rendered him unable to learn from his mistakes. As a consequence, we decided the mitigating evidence was relevant to the second special issue "only as an *aggravating* factor because it suggests a 'yes' answer to the question of future dangerousness." *Ibid.* The Court concluded that the trial court had erred in not instructing the jury that it could "consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty." *Id.*, at 328. The Court was most explicit in rejecting the dissent's concern that Penry was seeking a new rule, in contravention of *Teague* v. *Lane*, 489 U. S. 288 (1989). Indeed, the Court characterized its holding in *Penry* as a straightforward application of our earlier rulings in *Jurek, Lockett*, and *Eddings*, making it clear that these cases can stand together with *Penry*. See *Penry*, 492 U. S., at 314–318.

We confirmed this limited view of *Penry* and its scope in *Graham* v. *Collins*. There we confronted a claim by a defendant that the Texas system had not allowed for adequate consideration of mitigating evidence concerning his youth, family background, and positive character traits. In rejecting the contention that *Penry* dictated a ruling in the defendant's favor, we stated that *Penry* did not "effec[t] a sea change in this Court's view of the constitutionality of the former Texas death penalty statute," 506 U. S., at 474, and we noted that a contrary view of *Penry* would be inconsistent with the *Penry* Court's conclusion that it was not creating a "new rule," 506 U. S., at 474. We also did not accept the view that the *Lockett* and *Eddings* line of cases, upon which *Penry* rested, compelled a holding for the defendant in *Graham:*

> "In those cases, the constitutional defect lay in the fact that relevant mitigating evidence was placed beyond the effective reach of the sentencer. In *Lockett, Eddings, Skipper,* and *Hitchcock,* the sentencer was precluded from even considering certain types of mitigating evidence. In *Penry,* the defendant's evidence was placed before the sentencer but the sentencer had no reliable means of giving mitigating effect to that evidence. In this case, however, Graham's mitigating evidence was not placed beyond the jury's effective reach." *Graham,* 506 U. S., at 475.

In addition, we held that Graham's case differed from *Penry* in that "Graham's evidence—*unlike* Penry's—had mitigating relevance to the second special issue concerning his likely future dangerousness." 506 U. S., at 475. We concluded that, even with the benefit of the subsequent *Penry* decision, reasonable jurists at the time of Graham's sentencing "would [not] have deemed themselves compelled to accept Graham's claim." 506 U. S., at 477. Thus, we held that a ruling in favor of Graham would have required the impermissible application of a new rule under *Teague.* 506 U. S., at 477.

### III

Today we are asked to take the step that would have been a new rule had we taken it in *Graham.* Like Graham, petitioner contends that the Texas sentencing system did not allow the jury to give adequate mitigating effect to the evidence of his youth. Unlike Graham, petitioner comes here on direct review, so *Teague* presents no bar to the rule he seeks. The force of *stare decisis,* though, which rests on considerations parallel in many respects to *Teague,* is applicable here. The interests of the State of Texas, and of the victims whose rights it must vindicate, ought not to be turned aside when the State relies upon an interpretation of the Eighth Amendment approved by this Court, absent demonstration that our earlier cases were themselves a mis-

interpretation of some constitutional command. See, *e. g.,* *Vasquez* v. *Hillery,* 474 U. S. 254, 265–266 (1986); *Arizona* v. *Rumsey,* 467 U. S. 203, 212 (1984).

There is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury if a death sentence is to meet the requirements of *Lockett* and *Eddings.* See, *e. g.,* *Sumner* v. *Shuman,* 483 U. S. 66, 81–82 (1987); *Eddings,* 455 U. S., at 115; *Lockett,* 438 U. S., at 608 (plurality opinion). Our cases recognize that "youth is more than a chronological fact.   It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Eddings, supra,* at 115.   A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young.   These qualities often result in impetuous and ill-considered actions and decisions.   A sentencer in a capital case must be allowed to consider the mitigating qualities of youth in the course of its deliberations over the appropriate sentence.

The question presented here is whether the Texas special issues allowed adequate consideration of petitioner's youth. An argument that youth can never be given proper mitigating force under the Texas scheme is inconsistent with our holdings in *Jurek, Graham,* and *Penry* itself.   The standard against which we assess whether jury instructions satisfy the rule of *Lockett* and *Eddings* was set forth in *Boyde* v. *California,* 494 U. S. 370 (1990).   There we held that a reviewing court must determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Id.,* at 380.   Although the reasonable likelihood standard does not require that the defendant prove that it was more likely than not that the jury was prevented from giving effect to the evidence, the standard requires more than a mere possibility of such a bar.

*Ibid.* In evaluating the instructions, we do not engage in a technical parsing of this language of the instructions, but instead approach the instructions in the same way that the jury would—with a "commonsense understanding of the instructions in the light of all that has taken place at the trial." *Id.*, at 381.

We decide that there is no reasonable likelihood that the jury would have found itself foreclosed from considering the relevant aspects of petitioner's youth. Pursuant to the second special issue, the jury was instructed to decide whether there was "a probability that [petitioner] would commit criminal acts of violence that would constitute a continuing threat to society." App. 149. The jury also was told that, in answering the special issues, it could consider all the mitigating evidence that had been presented during the guilt and punishment phases of petitioner's trial. *Id.*, at 147. Even on a cold record, one cannot be unmoved by the testimony of petitioner's father urging that his son's actions were due in large part to his youth. It strains credulity to suppose that the jury would have viewed the evidence of petitioner's youth as outside its effective reach in answering the second special issue. The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside. We believe that there is ample room in the assessment of future dangerousness for a juror to take account of the difficulties of youth as a mitigating force in the sentencing determination. As we recognized in *Graham*, the fact that a juror might view the evidence of youth as aggravating, as opposed to mitigating, does not mean that the rule of *Lockett* is violated. *Graham*, 506 U. S., at 475–476. As long as the mitigating evidence is within "the effective reach of the sentencer," the requirements of the Eighth Amendment are satisfied. *Ibid.*

That the jury had a meaningful basis to consider the relevant mitigating qualities of petitioner's youth is what distinguishes this case from *Penry*. In *Penry*, there was expert medical testimony that the defendant was mentally retarded and that his condition prevented him from learning from experience. 492 U. S., at 308–309. Although the evidence of the mental illness fell short of providing Penry a defense to prosecution for his crimes, the Court held that the second special issue did not allow the jury to give mitigating effect to this evidence. Penry's condition left him unable to learn from his mistakes, and the Court reasoned that the only logical manner in which the evidence of his mental retardation could be considered within the future dangerousness inquiry was as an aggravating factor. *Id.*, at 323. *Penry* remains the law and must be given a fair reading. The evidence of petitioner's youth, however, falls outside *Penry*'s ambit. Unlike Penry's mental retardation, which rendered him unable to learn from his mistakes, the ill effects of youth that a defendant may experience are subject to change and, as a result, are readily comprehended as a mitigating factor in consideration of the second special issue.

Petitioner does not contest that the evidence of youth could be given some effect under the second special issue. Instead, petitioner argues that the forward-looking perspective of the future dangerousness inquiry did not allow the jury to take account of how petitioner's youth bore upon his personal culpability for the murder he committed. According to petitioner, "[a] prediction of future behavior is not the same thing as an assessment of moral culpability for a crime already committed." Brief for Petitioner 38. Contrary to petitioner's suggestion, however, this forward-looking inquiry is not independent of an assessment of personal culpability. It is both logical and fair for the jury to make its determination of a defendant's future dangerousness by asking the extent to which youth influenced the defendant's conduct. See *Skipper*, 476 U. S., at 5 ("Consideration of a de-

fendant's past conduct as indicative of his probable future behavior is an inevitable and not undesirable element of criminal sentencing"). If any jurors believed that the transient qualities of petitioner's youth made him less culpable for the murder, there is no reasonable likelihood that those jurors would have deemed themselves foreclosed from considering that in evaluating petitioner's future dangerousness. It is true that Texas has structured consideration of the relevant qualities of petitioner's youth, but in so doing, the State still "allow[s] the jury to give effect to [this] mitigating evidence in making the sentencing decision." *Saffle,* 494 U. S., at 491. Although Texas might have provided other vehicles for consideration of petitioner's youth, no additional instruction beyond that given as to future dangerousness was required in order for the jury to be able to consider the mitigating qualities of youth presented to it.

In a related argument, petitioner, quoting a portion of our decision in *Penry, supra,* at 328, claims that the jurors were not able to make a "reasoned moral response" to the evidence of petitioner's youth because the second special issue called for a narrow factual inquiry into future dangerousness. We, however, have previously interpreted the Texas special issues system as requiring jurors to "exercise a range of judgment and discretion." *Adams* v. *Texas,* 448 U. S. 38, 46 (1980). This view accords with a "commonsense understanding" of how the jurors were likely to view their instructions and to implement the charge that they were entitled to consider all mitigating evidence from both the trial and sentencing phases. *Boyde,* 494 U. S., at 381. The crucial term employed in the second special issue—"continuing threat to society"—affords the jury room for independent judgment in reaching its decision. Indeed, we cannot forget that "a Texas capital jury deliberating over the Special Issues is aware of the consequences of its answers, and is likely to weigh mitigating evidence as it formulates these answers in a manner similar to that employed by capital juries in

'pure balancing' States." *Franklin*, 487 U. S., at 182, n. 12
(plurality opinion). In *Blystone* v. *Pennsylvania*, 494 U. S.
299 (1990), four Members of the Court in dissent used the
Texas statute as an example of a capital sentencing system
that permitted the exercise of judgment. That opinion
stated:

> "[The two special issues] require the jury to do more
> than find facts supporting a legislatively defined aggra-
> vating circumstance. Instead, by focusing on the delib-
> erateness of the defendant's actions and his future dan-
> gerousness, the questions compel the jury to make a
> moral judgment about the severity of the crime and the
> defendant's culpability. The Texas statute directs the
> imposition of the death penalty only after the jury has
> decided that the defendant's actions were sufficiently
> egregious to warrant death." *Id.*, at 322 (Brennan, J.,
> dissenting).

The Texas Court of Criminal Appeals' view of the future
dangerousness inquiry supports our conclusion that consider-
ation of the second special issue is a comprehensive inquiry
that is more than a question of historical fact. In reviewing
death sentences imposed under the former Texas system,
that court has consistently looked to a nonexclusive list of
eight factors, which includes the defendant's age, in deciding
whether there was sufficient evidence to support a yes an-
swer to the second special issue. See, *e. g., Ellason* v. *State*,
815 S. W. 2d 656, 660 (1991); *Brasfield* v. *State*, 600 S. W. 2d
288 (1980).

There might have been a juror who, on the basis solely of
sympathy or mercy, would have opted against the death
penalty had there been a vehicle to do so under the Texas
special issues scheme. But we have not construed the *Lock-
ett* line of cases to mean that a jury must be able to dispense
mercy on the basis of a sympathetic response to the defend-
ant. Indeed, we have said that "[i]t would be very difficult

to reconcile a rule allowing the fate of a defendant to turn on the vagaries of particular jurors' emotional sensitivities with our longstanding recognition that, above all, capital sentencing must be reliable, accurate, and nonarbitrary." *Saffle* v. *Parks*, 494 U. S., at 493; see also *California* v. *Brown*, 479 U. S. 538, 542–543 (1987) (permitting an instruction that the jury could not base its sentencing decision on sympathy).

For us to find a constitutional defect in petitioner's death sentence, we would have to alter in significant fashion this Court's capital sentencing jurisprudence. The first casualty of a holding in petitioner's favor would be *Jurek*. The inevitable consequence of petitioner's argument is that the Texas special issues system in almost every case would have to be supplemented by a further instruction. As we said in *Graham:*

> "[H]olding that a defendant is entitled to special instructions whenever he can offer mitigating evidence that has *some* arguable relevance beyond the special issues . . . would be to require in all cases that a fourth 'special issue' be put to the jury: '"Does any mitigating evidence before you, whether or not relevant to the above [three] questions, lead you to believe that the death penalty should not be imposed?"'" 506 U. S., at 476 (quoting *Franklin, supra,* at 180, n. 10).

In addition to overruling *Jurek*, accepting petitioner's arguments would entail an alteration of the rule of *Lockett* and *Eddings*. Instead of requiring that a jury be able to consider in some manner all of a defendant's relevant mitigating evidence, the rule would require that a jury be able to give effect to mitigating evidence in every conceivable manner in which the evidence might be relevant.

The fundamental flaw in petitioner's position is its failure to recognize that "[t]here is a simple and logical difference between rules that govern what factors the jury must be

permitted to consider in making its sentencing decision and rules that govern how the State may guide the jury in considering and weighing those factors in reaching a decision." *Saffle, supra,* at 490. To rule in petitioner's favor, we would have to require that a jury be instructed in a manner that leaves it free to depart from the special issues in every case. This would, of course, remove all power on the part of the States to structure the consideration of mitigating evidence—a result we have been consistent in rejecting. See, *e. g., Boyde,* 494 U. S., at 377; *Saffle, supra,* at 493; *Franklin, supra,* at 181 (plurality opinion).

The reconciliation of competing principles is the function of law. Our capital sentencing jurisprudence seeks to reconcile two competing, and valid, principles in *Furman,* which are to allow mitigating evidence to be considered and to guide the discretion of the sentencer. Our holding in *Jurek* reflected the understanding that the Texas sentencing scheme "accommodates *both* of these concerns." *Franklin, supra,* at 182 (plurality opinion). The special issues structure in this regard satisfies the Eighth Amendment and our precedents that interpret its force. There was no constitutional infirmity in its application here.

The judgment of the Texas Court of Criminal Appeals is affirmed.

*It is so ordered.*

JUSTICE SCALIA, concurring.

In my view the *Lockett-Eddings* principle that the sentencer must be allowed to consider "all relevant mitigating evidence" is quite incompatible with the *Furman* principle that the sentencer's discretion must be channeled. See *Walton* v. *Arizona,* 497 U. S. 639, 656 (1990) (SCALIA, J., concurring in part and concurring in judgment). That will continue to be true unless and until the sort of "channeling" of mitigating discretion that Texas has engaged in here is not merely *permitted* (as the Court today holds), but positively

*required*—a further elaboration of our intricate Eighth Amendment jurisprudence that I neither look forward to nor would support.

Today's decision, however, is simply a clarification (and I think a plainly correct one) of this Court's opinions in *Franklin* v. *Lynaugh*, 487 U. S. 164 (1988) (plurality opinion), and *Boyde* v. *California*, 494 U. S. 370 (1990), which I joined. In fact, the essence of today's holding (to the effect that discretion *may* constitutionally be channeled) was set forth in my dissent in *Penry* v. *Lynaugh*, 492 U. S. 302, 350 (1989) (SCALIA, J., concurring in part and dissenting in part). Accordingly, I join the opinion of the Court.

JUSTICE THOMAS, concurring.

Although *Penry* v. *Lynaugh*, 492 U. S. 302 (1989), "remains the law," *ante*, at 369, in the sense that it has not been expressly overruled, I adhere to my view that it was wrongly decided. *Graham* v. *Collins*, 506 U. S. 461, 478 (1993) (THOMAS, J., concurring). I also continue to believe it has been substantially narrowed by later opinions. *Id.*, at 497, n. 10. Because petitioner's youth had mitigating relevance to the second special issue, however, this case is readily distinguishable from *Penry* and does not compel its reconsideration. I therefore join the Court's opinion.

JUSTICE O'CONNOR, with whom JUSTICE BLACKMUN, JUSTICE STEVENS, and JUSTICE SOUTER join, dissenting.

Dorsie Lee Johnson was 19 years old when he committed the murder that led to his death sentence. Today, the Court upholds that sentence, even though the jurors who considered Johnson's case were not allowed to give full effect to his strongest mitigating evidence: his youth. The Court reaches this result only by invoking a highly selective version of *stare decisis* and misapplying our habeas precedents to a case on direct review. Therefore, I respectfully dissent.

## I

By all accounts, Dorsie Johnson was not a model youth. As an adolescent he frequently missed school, and when he did attend, he often was disruptive. He was drinking and using drugs by the time he was 16, habits that had intensified by the time he was 19. Johnson's father testified that the deaths of Johnson's mother and sister in 1984 and 1985 had affected Johnson deeply, but he primarily attributed Johnson's behavior to drug use and youth. A jury hearing this evidence easily could conclude, as Johnson's jury did, that the answer to the second Texas special question—whether it was probable that Johnson "would commit criminal acts of violence that would constitute a continuing threat to society," Tex. Code Crim. Proc. Ann., Art. 37.071(b)(2) (Vernon 1981)—was yes. It is possible that the jury thought Johnson might outgrow his temper and violent behavior as he matured, but it is more likely that the jury considered the pattern of escalating violence to be an indication that Johnson would become even more dangerous as he grew older. Even if the jurors viewed Johnson's youth as a transient circumstance, the dangerousness associated with that youth would not dissipate until sometime in the future, and it is reasonably likely that the jurors still would have understood the second question to require an affirmative answer. See *Graham* v. *Collins*, 506 U. S. 461, 519–520 (1993) (SOUTER, J., dissenting). Thus, to the extent that Johnson's youth was relevant at all to the second Texas special issue, there is a reasonable likelihood that it was an aggravating factor.

But even if the jury could give some mitigating effect to youth under the second special issue, the Constitution still would require an additional instruction in this case. The additional instruction would be required because not one of the special issues under the former Texas scheme, see Art. 37.071, allows a jury to give effect to the most relevant mitigating aspect of youth: its relation to a defendant's "culpability for the crime he committed." *Skipper* v. *South Caro-*

*lina,* 476 U. S. 1, 4 (1986). A violent and troubled young person may or may not grow up to be a violent and troubled adult, but what happens in the future is unrelated to the *culpability* of the defendant at the time he committed the crime. A jury could conclude that a young person acted "deliberately," Art. 37.071(b)(1), and that he will be dangerous in the future, Art. 37.071(b)(2), yet still believe that he was less culpable *because of his youth* than an adult. I had thought we made clear in *Eddings v. Oklahoma,* 455 U. S. 104 (1982), that the vicissitudes of youth bear directly on the young offender's culpability and responsibility for the crime:

> "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage. Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults. Particularly during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment expected of adults." *Id.,* at 115–116 (footnotes and internal quotation marks omitted).

See also *Graham, supra,* at 518 (SOUTER, J., dissenting) ("Youth may be understood to mitigate by reducing a defendant's moral culpability for the crime, for which emotional and cognitive immaturity and inexperience with life render him less responsible").* In my view, the jury could not express

---

*Of the 36 States that have death penalty statutes, 30 either specifically list the age of the defendant as a mitigating circumstance or prohibit the execution of those under 18. See Ala. Code § 13A–5–51(7) (1982); Ariz. Rev. Stat. Ann. § 13–703(G)(5) (1989); Ark. Code Ann. § 5–4–605(4) (1987); Cal. Penal Code Ann. § 190.3(i) (West 1988); Colo. Rev. Stat. §§ 16–11–802(1)(a), (4)(a) (Supp. 1992); Conn. Gen. Stat. § 53a–46a(g)(1) (1985); Fla. Stat. §§ 921.141(6)(g), 921.142(7)(f) (Supp. 1992); Ill. Rev. Stat., ch. 720, ¶ 5/9–1(c) (1992); Ind. Code § 35–50–2–9(c)(7) (Supp. 1992); Ky. Rev. Stat. Ann. § 532.025(2)(b)(8) (Baldwin 1989); La. Code Crim. Proc. Ann., Art. 905.5(f) (West 1984); Md. Ann. Code, Art. 27, § 413(g)(5) (Supp. 1992); Miss. Code

a "reasoned moral response" to this aspect of Johnson's youth in answering any of the special issues. *Penry* v. *Lynaugh*, 492 U. S. 302, 328 (1989) (internal quotation marks omitted).

## II

In *Graham* v. *Collins, supra,* the Court held that the relief Johnson seeks today was not "'*dictated* by precedent'" and therefore not available on collateral review. *Id.,* at 467 (quoting *Teague* v. *Lane,* 489 U. S. 288, 301 (1989) (plurality opinion)). The issue in *Graham* was not whether an additional instruction to allow the jury to give full effect to Graham's youth was constitutionally mandated. It was only whether the need for such an instruction was "susceptible to debate among reasonable minds." 506 U. S., at 476 (internal quotation marks omitted). I did not agree with the Court's conclusion in *Graham*, see *id.,* at 504–505 (SOUTER, J., dissenting), but even if I had, I would not find *Graham* controlling today.

*Teague* v. *Lane, supra,* states a rule of collateral review: New constitutional rules will not be applied retroactively to invalidate final state convictions on federal habeas review. *Teague* analysis is a threshold issue, see *id.,* at 300–301 (plu-

---

Ann. § 99–19–101(6)(g) (Supp. 1992); Mo. Rev. Stat. § 565.032.3(7) (Supp. 1992); Mont. Code Ann. § 46–18–304(7) (1991); Neb. Rev. Stat. § 29–2523(2)(d) (1989); Nev. Rev. Stat. § 200.035(6) (1992); N. H. Rev. Stat. Ann. § 630:5(VI)(d) (Supp. 1992); N. J. Stat. Ann. § 2C:11–3(c)(5)(c) (West 1982); N. M. Stat. Ann. § 31–20A–6(I) (1990); N. C. Gen. Stat. § 15A–2000(f)(7) (1988); Ohio Rev. Code Ann. § 2929.04(B)(4) (1993); Ore. Rev. Stat. § 163.150(1)(c)(A) (1991); Pa. Stat. Ann., Tit. 42, § 9711(e)(4) (Purdon 1982); S. C. Code Ann. § 16–3–20(C)(b)(7) (Supp. 1992); Tenn. Code Ann. § 39–13–204(j)(7) (1991); Utah Code Ann. § 76–3–207(3)(e) (Supp. 1992); Va. Code Ann. § 19.2–264.4(B)(v) (1990); Wash. Rev. Code § 10.95.070(7) (1992). The remaining six States allow the jury to consider any evidence in mitigation without specifying examples. See Del. Code Ann., Tit. 11, § 4209(c) (1987 and Supp. 1992); Ga. Code Ann. § 17–10–30(b) (1990); Idaho Code § 19–2515(c) (1987); Okla. Stat., Tit. 21, § 701.10(C) (Supp. 1992); S. D. Codified Laws § 23A–27A–1 (Supp. 1993); current Tex. Code Crim. Proc. Ann., Art. 37.071, § 2(e) (Vernon Supp. 1993).

rality opinion), however, and cases that reject a claim as requiring a new rule cannot constitute *stare decisis* on direct review. The purpose of *Teague* is to accommodate the competing demands of constitutional imperatives and the "principle of finality which is essential to the operation of our criminal justice system," *id.*, at 309. See *Desist* v. *United States,* 394 U. S. 244, 260–269 (1969) (Harlan, J., dissenting). But the finality concerns of *Teague* come into play only after this Court has denied certiorari or the time for filing a petition for certiorari from the judgment affirming the conviction has expired. See *Griffith* v. *Kentucky,* 479 U. S. 314, 321, n. 6 (1987). Until that time, the interests of finality and comity that caused us to implement the *Teague* standards of retroactivity are not at issue. The only demands with which we need, indeed, must, concern ourselves are those of the Constitution. On direct review, it is our constitutionally imposed duty to resolve "all cases before us . . . in light of our best understanding of governing constitutional principles," *Mackey* v. *United States,* 401 U. S. 667, 679 (1971) (Harlan, J., concurring in judgment), without regard to reliance interests of the State.

The analysis of our collateral review doctrine, as well as its purpose, makes the majority's emphasis on cases decided under *Teague* inappropriate in a direct review case. When determining whether a rule is new, we do not ask whether it fairly can be discerned from our precedents; we do not even ask if most reasonable jurists would have discerned it from our precedents. We ask only whether the result was *dictated* by past cases, or whether it is "susceptible to debate among reasonable minds," *Butler* v. *McKellar,* 494 U. S. 407, 415 (1990). And we have recognized that answering this question is difficult, especially when we are faced with the application of settled law to new facts. *Id.,* at 414–415.

If the rule the petitioner sought in *Graham* was a new rule, it was one only because we had never squarely held that the former Texas special issues required an additional instruction regarding youth. That we have not addressed

this particular combination of circumstances on direct review until today, however, cannot create an insurmountable reliance interest in the State of Texas, as the Court suggests. See *ante*, at 366–367. To allow our failure to address an issue to create such an interest would elevate our practice of letting issues "percolate" in the 50 States in the interests of federalism over our responsibility to resolve emerging constitutional issues. On direct review, the question is what the Constitution, read in light of our precedents, requires. In my view, the Eighth Amendment requires an additional instruction in this case.

### III

### A

There is considerable support in our early cases for the proposition that the sentencer in a capital case must be able to give *full* effect to all mitigating evidence concerning the defendant's character and record and the circumstances of the crime. The Court first recognized the need to give effect to mitigating circumstances in the group of capital cases decided after *Furman* v. *Georgia*, 408 U. S. 238 (1972). In three of those cases, Justices Stewart, Powell, and STEVENS upheld capital sentencing laws against facial challenges, in large part because they believed that the statutes narrowed the category of defendants subject to the death penalty at the same time that they allowed for consideration of the mitigating circumstances regarding the individual defendant and the particular crime. See *Gregg* v. *Georgia*, 428 U. S. 153, 196–197 (1976) (joint opinion); *Proffitt* v. *Florida*, 428 U. S. 242, 250–253 (1976) (joint opinion); *Jurek* v. *Texas*, 428 U. S. 262, 270–274 (1976) (joint opinion). In two other cases, the joint opinions found mandatory death penalty statutes unconstitutional. See *Woodson* v. *North Carolina*, 428 U. S. 280, 303–305 (1976) (plurality opinion); *Roberts* v. *Louisiana*, 428 U. S. 325, 333–336 (1976) (plurality opinion). A mandatory death penalty certainly limited the discretion of the sentencer, but it was not "consistent with the Constitution."

*Ante*, at 360. The plurality opinion in *Woodson* recognized that allowing a sentencer to consider, but not to give effect to, mitigating circumstances would result in the arbitrary and capricious jury nullification that prevailed prior to *Furman*. See *Woodson*, 428 U. S., at 303. Furthermore, "[a] process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind." *Id.*, at 304.

We returned to the issue of mitigating circumstances two Terms later. The Ohio death penalty statute required the sentencer to impose the death penalty on a death-eligible defendant unless one of three mitigating circumstances was established by a preponderance of the evidence. See *Lockett* v. *Ohio*, 438 U. S. 586, 599, n. 7, and 607 (1978) (plurality opinion). In determining the existence of the three circumstances, the sentencer was to consider " 'the nature and circumstances of the offense and the history, character, and condition of the offender.' " *Id.*, at 612 (quoting Ohio Rev. Code Ann. § 2929.04(B) (1975)). The Ohio Supreme Court had held that the mitigating circumstances were to be construed liberally, but a plurality of this Court nevertheless found the statute too narrow to pass constitutional muster. 438 U. S., at 608. The *Lockett* plurality concluded from the post-*Furman* cases that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U. S., at 604 (footnote omitted). The statute at issue specifically directed the sentencer to *consider* those very factors. Nevertheless, the plurality found the statute unconstitutional because it provided no *method* by which such consideration

could "affect the sentencing decision." *Id.*, at 608. Accord, *Bell* v. *Ohio*, 438 U. S. 637, 641–642 (1978) (petitioner's counsel offered a wide range of mitigating evidence at the penalty phase, and according to the Ohio statute, the sentencer was to consider that evidence; petitioner's death sentence reversed nevertheless because the statute unconstitutionally limited consideration of the evidence as mitigating factors).

The Court next addressed the constitutional requirement that a sentencer be allowed to give *full* consideration and *full* effect to mitigating circumstances in *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982). Although the Oklahoma death penalty statute contained no specific restrictions on the types of mitigating evidence that could be considered, neither the Oklahoma trial court nor the Court of Criminal Appeals believed that it could consider, as mitigating factors, the evidence of petitioner's unhappy upbringing and emotional disturbance. See *id.*, at 109–110. The Court reversed petitioner's death sentence. In so doing, it reaffirmed the rule of *Lockett:* The sentencer in a capital case must be permitted to consider relevant mitigating factors in ways that can affect the sentencing decision. This rule, the Court explained, accommodated the twin objectives of our Eighth Amendment jurisprudence: "measured, consistent application and fairness to the accused." 455 U. S., at 111.

Four years later, the Court again made plain that *Lockett* and *Eddings* meant what they said. In *Skipper* v. *South Carolina*, 476 U. S. 1 (1986), we reiterated that evidence, even if not "relate[d] specifically to petitioner's culpability for the crime he committed," *id.*, at 4, must be treated as relevant mitigating evidence if it serves "'as a basis for a sentence less than death,'" *id.*, at 5 (quoting *Lockett, supra*, at 604). We summarized the "constitutionally permissible range of discretion in imposing the death penalty" the following Term in *McCleskey* v. *Kemp*, 481 U. S. 279, 305–306 (1987):

"First, there is a required threshold below which the death penalty cannot be imposed. In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold. . . . Second, States cannot *limit* the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty. In this respect, *the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information offered by the defendant.*" *Id.*, at 305–306 (emphases added).

We have adhered to this "constitutionally permissible range of discretion" again and again in the years since we decided *McCleskey*, most recently in *McKoy* v. *North Carolina*, 494 U. S. 433 (1990). Accord, *Hitchcock* v. *Dugger*, 481 U. S. 393, 398–399 (1987); *Penry* v. *Lynaugh*, 492 U. S. 302, 319–328 (1989). The Court attempts to limit these cases by relying on plurality opinions, concurrences, and dicta, see, *e. g., ante,* at 361–362, but until today a majority of this Court has declined to upset our settled Eighth Amendment jurisprudence.

## B

Despite the long line of precedent supporting Johnson's argument that the State impermissibly limited the effect that could be given to his youth, the Court, like respondent and the Texas Court of Criminal Appeals, clings doggedly to *Jurek* v. *Texas*, 428 U. S. 262 (1976) (joint opinion). The interpretation on which the Court today relies, however, has nothing to do with what the Court actually decided in *Jurek*. *Jurek* was one of five cases in which this Court evaluated the States' attempts after *Furman* to enact constitutional death penalty statutes. The statutes at issue had been applied a limited number of times, and, of necessity, the challenges were all facial. The Texas Court of Criminal

Appeals, for example, had examined the application of the Texas statute only twice: in *Jurek* itself, and in one other case. 428 U. S., at 273. Because of the posture of the case and the limited history of the statute's application, the Court could not, and did not, determine the statute's constitutionality in all circumstances. Instead, the joint opinion, which contained the narrowest ground of decision in the case, read the Texas court's interpretation of the statute as allowing the jury to consider the "particularized circumstances of the individual offense and the individual offender" before death is imposed. *Id.*, at 274. Therefore, the joint opinion held that the statute fell within what we later called the "constitutionally permissible range of discretion in imposing the death penalty," *McCleskey* v. *Kemp, supra*, at 305. *Jurek, supra*, at 276.

Because *Jurek* involved only a facial challenge to the Texas statute, the constitutionality of the statute as implemented in particular instances was not at issue. Nor was the "as-applied" constitutionality of the statute implicated in any of our cases until *Franklin* v. *Lynaugh*, 487 U. S. 164 (1988). In *Adams* v. *Texas*, 448 U. S. 38 (1980), for example, the Court still expressed the view that the statute allowed members of the jury to consider *all* relevant evidence, and to use that evidence in answering the special questions, "while remaining true to their instructions and their oaths." *Id.*, at 46. The same is true of the plurality opinion in *Lockett*, which stated that the joint opinion in *Jurek* had approved the Texas statute because it "concluded that the Texas Court of Criminal Appeals had broadly interpreted the second question—despite its facial narrowness." 438 U. S., at 607.

When the Court addressed its first as-applied challenge to the Texas death penalty statute in *Franklin*, it was clear that any statements in *Jurek* regarding the statute's constitutionality were conditioned on a particular understanding of state law. *Jurek* simply had not upheld the Texas death penalty statute in all circumstances. In fact, five Members

of the Court rejected the *Franklin* plurality's reliance on *Jurek* and disagreed with the plurality's suggestion that a State constitutionally could limit the "ability of the sentencing authority to give *effect* to mitigating evidence relevant to a defendant's character or background or to the circumstances of the offense." 487 U. S., at 183–185 (O'CONNOR, J., joined by BLACKMUN, J., concurring in judgment) (emphasis added); *id.*, at 194–200 (STEVENS, J., joined by Brennan and Marshall, JJ., dissenting). See also *Penry* v. *Lynaugh*, 492 U. S., at 320–321 ("[B]oth the concurrence and the dissent [in *Franklin*] understood *Jurek* as resting fundamentally on the express assurance that the special issues would permit the jury to fully consider all the mitigating evidence a defendant introduced").

The view of the five concurring and dissenting Justices that the facial review in *Jurek* did not decide the issue presented in *Franklin* is not surprising. After all, the same day we approved the Texas death penalty statute in *Jurek*, we also approved the death penalty statutes of Georgia and Florida. See *Gregg* v. *Georgia*, 428 U. S. 153 (1976) (joint opinion); *Proffitt* v. *Florida*, 428 U. S. 242 (1976) (joint opinion). Yet after *Gregg* and *Proffitt* and prior to *Franklin*, we held unconstitutional specific applications of the same Georgia and Florida statutes we earlier had approved. See *Godfrey* v. *Georgia*, 446 U. S. 420 (1980) (vague and overly broad construction of aggravating factor rendered death sentence unconstitutional); *Hitchcock* v. *Dugger, supra* (holding it unconstitutional to restrict jury's consideration of mitigating factors to those enumerated in the statute). Despite this majority view of *Jurek* and the Texas death penalty statute, the Court today relies on the minority view in *Franklin*. It goes so far as to note with approval the minority position that "*Jurek* foreclosed the defendant's argument that the jury was still entitled to cast an 'independent' vote against the death penalty even if it answered yes to the special is-

sues." *Ante*, at 364 (citing *Franklin, supra*, at 180). This reading of *Franklin* turns *stare decisis* on its head.

Although the majority of Justices in *Franklin* did not accept the contention that the State constitutionally could limit a sentencer's ability to give effect to mitigating evidence, two Justices concurred in the judgment because they believed that on the facts of that case the State had not limited the effect the evidence could be given. 487 U. S., at 185 (O'CONNOR, J., joined by BLACKMUN, J., concurring in judgment). Thus, resolution of the issue was left open. The following Term, however, the Court squarely addressed the constitutionality of limiting the effect a Texas jury could give to relevant mitigating evidence, and contrary to the majority opinion today, we plainly held that the Texas special issues violated the Eighth Amendment to the extent they prevented the jury from giving full consideration *and* effect to a defendant's relevant mitigating evidence. *Penry* v. *Lynaugh*, 492 U. S. 302 (1989).

*Penry* was in no way limited to evidence that is only aggravating under the "future dangerousness" issue. We stated there that "*Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence." *Id.*, at 319. That we meant "full effect" is evident from the remainder of our discussion. We first determined that Penry's evidence of mental retardation and his abused childhood was relevant to the question whether he acted deliberately under the first special issue. *Id.*, at 322. But having *some* relevance to an issue was not sufficient, and the problem was not, as the Court today suggests, see *ante*, at 364–365, simply that no jury instruction defined the term "deliberately." Instead, we noted that the jury must be able to give effect to the evidence as it related to Penry's "[p]ersonal culpability," which "is not solely a function of a defendant's capacity to act 'deliberately.'" 492 U. S., at 322. The jury could not

give full effect to Penry's evidence under the first special issue because "deliberately" was not defined "in a way that would clearly direct the jury to consider fully Penry's mitigating evidence *as it bears on his personal culpability."* *Id.,* at 323 (emphasis added). That is, the evidence had relevance beyond the scope of the first issue. *Id.,* at 322.

We concluded that the second special issue, like the first, did not allow a jury to give effect to a mitigating aspect of mental retardation: the diminution of culpability. *Id.,* at 323–324. The Court today makes much of our finding that the "only" relevance of Penry's evidence to the second issue was as an aggravating factor, see *id.,* at 323. *Ante,* at 365. But in so doing, it takes our factual description of Penry's evidence as a "two-edged sword" out of context. The second special issue was not inadequate because the evidence worked only against Penry; it was inadequate because it did not allow the jury to give full effect to Penry's mitigating evidence. *Penry,* 492 U. S., at 323. Our discussion of the third special issue—whether the defendant's conduct was unreasonable in response to the provocation—also focused on the inability of a juror to express the view that Penry lacked "the moral culpability to be sentenced to death" in answering the question. *Id.,* at 324–325. The point of *Penry* is clear: A death sentence resulting from application of the Texas special issues cannot be upheld unless the jurors are able to consider fully a defendant's mitigating evidence. Accord, *id.,* at 355 (SCALIA, J., concurring in part and dissenting in part) (The Court today holds that "the constitutionality turns on whether the [special] questions allow mitigating factors not only to be considered . . . , *but also to be given effect in all possible ways, including ways that the questions do not permit"*).

## C

Our recent cases are not to the contrary. In *Boyde* v. *California,* 494 U. S. 370 (1990), for example, the Court relied on two straightforward propositions to reject petition-

er's claim that the California death penalty was unconstitutional. First, we rejected the argument that requiring the jury to weigh aggravating and mitigating factors, and then sentence petitioner accordingly, violated the requirement of individualized sentencing. The petitioner in *Boyde* did not allege that the instruction interfered with the jury's consideration of mitigating evidence; instead, he essentially argued for the constitutional right to an instruction on jury nullification. See *id.*, at 377. We also addressed (and rejected) petitioner's challenge to a "catch-all" instruction that told the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." *Id.*, at 374 (internal quotation marks omitted). We reiterated our long-time understanding that the "Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by petitioner," *id.*, at 377–378, but found that the challenged instruction did not "restrict impermissibly [the] jury's consideration of relevant evidence," *id.*, at 378. Accord, *id.*, at 382–384. Our holding in *Boyde* did not constrict or limit our prior cases on the requirements of the Eighth Amendment.

The Court's reliance on *Saffle* v. *Parks*, 494 U. S. 484 (1990), also is misplaced. In *Saffle*, the only issue was whether it would be a new rule under the standards of *Teague* v. *Lane*, 489 U. S. 288 (1989), for a defendant to be entitled to an instruction allowing the jury to decline to impose the death penalty based on mere sympathy. We held that it would. 494 U. S., at 489. To be sure, there is language in *Saffle* suggesting that a State may limit a sentencer's consideration of mitigating evidence so long as the sentencer may give some effect to the evidence. See, *e. g.*, *id.*, at 490–491. But to the extent *Saffle* suggests anything more than that the State may prevent the sentencer from declining to impose the death penalty based on mere sympathy, the language is dictum and cannot be construed as over-

ruling 17 years of precedent. Limiting a sentencer's discretion to react based on unfocused sympathy is not the equivalent of preventing a sentencer from giving a "reasoned *moral* response," *id.*, at 493 (internal quotation marks omitted), based on "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death," *id.*, at 489 (internal quotation marks omitted). This Court has reaffirmed continually since 1976 that the Constitution prohibits the latter limitation.

\*   \*   \*

"[Y]outh is more than a chronological fact." *Eddings*, 455 U. S., at 115. The emotional and mental immaturity of young people may cause them to respond to events in ways that an adult would not. Because the jurors in Johnson's case could not give effect to this aspect of Johnson's youth, I would vacate Johnson's sentence and remand for resentencing.