OPINION OF THE COURT
Joseph A. Zayas, J.
Defendant, charged as a juvenile offender, moves for an order removing this matter to Family Court pursuant to Criminal Procedure Law § 210.43 (1), following his indictment for robbery in the first degree (Penal Law § 160.15 [4]) and related offenses. Defendant’s motion requires the court to consider the “interests of justice” factors set forth in CPL 210.43 (2), in light of recently proposed state legislation to raise the age of criminal responsibility, as well as recent judicial recognition that “society’s understanding of juvenile brain function and the relationship between youth and unlawful behavior has significantly evolved” (People v Rudolph, 21 NY3d 497, 506 [2013, Graffeo, J., concurring]), particularly since 1978, when the legislature first “lowered the threshold for criminal responsibility to the age of thirteen for specific criminal offenses” (Peter Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 180.75 at 227 [2007 ed]).
According to the complainant, defendant and a codefendant, who was also charged as a juvenile offender, approached the complainant on the boardwalk of Rockaway Beach in March 2014. The codefendant “stopped [the complainant] in [her] path,” saying, “give me everything you got,” while defendant stood nearby waving what appeared to be a black firearm (which turned out to be an unloaded “air pistol” or “BB gun”) at the complainant. After the complainant handed money over to the codefendant, who the complainant described as the “larger kid,” the codefendant said, “we know where you live” and “don’t tell anyone about this.” The codefendant also ordered the complainant to give him her phone. Although the complainant complied, she also threatened to have the phone “traced” and demanded *384 that the phone be returned to her. The codefendant then threw the phone back at the complainant, and defendant and the co-defendant then ran away. The police soon arrested defendant and the codefendant and recovered a black, unloaded “air pistol” or “BB gun,” which the complainant identified as the “firearm” displayed during the robbery. Defendant also admitted his role in the crime, saying that they used a “BB gun.” Defendant, who has no prior history with the criminal justice system or the juvenile delinquency system, is now 16 years old but was 15 years old at the time of the alleged offense.
Although defendant generally argues that consideration of the interests of justice factors set forth in CPL 210.43 (2) militates in favor of removing the matter to Family Court, his primary argument is that the interests of justice equation itself has been effectively altered since 1978 (the year the Juvenile Offender Law was enacted) by various judicial pronouncements, empirical studies and technological advances, all of which have “call[ed] into question the premises upon which the Juvenile Offender Law is based and [the] wisdom of prosecuting children as adults.” The People oppose the motion, arguing that the CPL 210.43 (2) factors, particularly the seriousness of the offense charged, require the court to retain jurisdiction of the matter in Supreme Court.
Prior to 1978, “children under the age of 16 were not subject to criminal sanctions in New York State in any circumstances. . . . [and instead] were all dealt with through a separate juvenile delinquency system” in Family Court (Matter of Vega v Bell, 47 NY2d 543, 547 [1979]). In 1978, however, the legislature, “react[ing] to a perceived epidemic of violent criminal conduct by juveniles” (Matter of Raymond G., 93 NY2d 531, 534 [1999]), enacted “drastic changes” and “harsh measures” (.Matter of Vega at 547-548)—provisions which “divested the Family Court of original jurisdiction” over cases in which 13-to-15-year-old juveniles (i.e., “Juvenile offender[s]” under CPL 1.20 [42]) are charged with certain specified violent felony offenses (Matter of Raymond G. at 535). Despite the “drastic” and “harsh” nature of the new legislation, “the Legislature nonetheless remained sensitive to the fact that special considerations are sometimes appropriate when dealing with juveniles, who are more easily influenced by their companions and their environment than are adults” (Matter of Vega at 548). One of those “special considerations” in the statutory scheme is the provision “whereby, at various stages in a criminal proceeding, *385 a juvenile offender may be removed to Family Court if it becomes apparent in a particular case that such treatment would be more appropriate than continuation of [the] criminal prosecution” (id.).
Criminal Procedure Law § 210.43 (1) (a), although not part of the original statutory scheme, is one of those “escape hatch” provisions (Peter Preiser, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11A, CPL 1.20 at 30 [2003 ed]). It provides, in pertinent part, that “after arraignment of a juvenile offender upon an indictment, the superior court may, on motion of any party or on its own motion . . . order removal of the action to the family court . . . , if . . . the court determines that to do so would be in the interests of justice” (CPL 210.43 [1]). Although the Court of Appeals in Matter of Vega v Bell (47 NY2d at 553) has indicated that removal to Family Court would only be “proper” in the “unusual or exceptional case,” there is no language in the statute itself (or the analogous statute which the Court in Matter of Vega was actually interpreting, CPL 180.75) which expressly places such a limitation on the statutory removal power of the trial court determining a motion under CPL 210.43. Instead, the actual language of CPL 210.43 (2) provides that in “making its [interests of justice] determination,” the court “shall, to the extent applicable, examine individually and collectively” a variety of factors, including:
“(a) the seriousness and circumstances of the offense;
“(b) the extent of harm caused by the offense;
“(c) the evidence of guilt, whether admissible or inadmissible at trial;
“(d) the history, character and condition of the defendant;
“(e) the purpose and effect of imposing upon the defendant a sentence authorized for the offense;
“(f) the impact of a removal of the case to the family court on the safety or welfare of the community;
“(g) the impact of a removal of the case to the family court upon the confidence of the public in the criminal justice system;
“(h) where the court deems it appropriate, the attitude of the complainant or victim with respect to the motion; and
“(i) any other relevant fact indicating that a judgment of conviction in the criminal court would serve no useful purpose.”
*386 Furthermore, because the defendant is not charged with an offense for which removal would require the consent of the People (see CPL 210.43 [1] [b]),[1] the court may order removal of defendant’s case to Family Court over the People’s objection. Providing courts with the “authority to remove” a case to Family Court without the People’s consent was “deemed . . . necessary” by the legislature “because of its realization that in certain rare instances a prosecutor may be too closely involved in the prosecution to appreciate the benefits of juvenile treatment” (Matter of Vega at 552-553).
Here, the People concede that defendant’s case is removable to Family Court without the People’s consent. The only real question is whether removal “would be in the interests of justice” (CPL 210.43 [1] [a]). The court finds that, upon examination of the various factors in CPL 210.43 (2), removal of defendant’s case to Family Court “would be in the interests of justice” (CPL 210.43 [1] [a]). Indeed, it is “apparent” to this court that Family Court “treatment” of defendant’s “particular case . . . would be more appropriate than continuation of [the] criminal prosecution” (Matter of Vega at 548), particularly given the nature and circumstances of the offense, the history and condition of the defendant, the “compassion” expressed by the complainant, and the shifting “confidence of the public” relating to the issue of whether family courts or criminal courts are the more appropriate forum to adjudicate juvenile crime. In short, defendant’s matter represents the “unusual or exceptional case” which warrants removal to Family Court (id. at 553).
Because defendant primarily relies upon his argument that the interests of justice equation itself has been effectively altered since 1978 by various judicial pronouncements, social science studies and technological advances, the court will address that argument first. Defendant argues that the foregoing “eall[s] into question the premises upon which the Juvenile Offender *387 Law is based and [the] wisdom of prosecuting children as adults.” The problem with the defendant’s argument, of course, is that the validity of the “premises” of the Juvenile Offender Law and the “wisdom of prosecuting children as adults,” is a quintessential legislative function and not a judicial function (see generally People v Smith, 79 NY2d 309, 311 [1992] [the Court’s “purpose is not to pass on the wisdom of a statute or any of its requirements, but rather to implement the will of the Legislature as expressed in its enactment”]). No amount of evolution of thought or enlightenment regarding the “wisdom of prosecuting children as adults” could judicially undo the 1978 legislation which raised the age of criminal responsibility. Only the legislature can reconsider the legislative choices it made in 1978; and apparently there is a legislative and executive movement afoot to do just that (see infra at 388-389). Until then, however, this court must abide by the terms of the statute actually enacted.
Yet, the actual terms of that statute—in particular, the mandate that the court “shall . . . examine and consider” various interest of justice factors, including “the impact of a removal of the case to the family court upon the confidence of the public in the criminal justice system,” and “any other relevant fact indicating that a judgment of conviction in the criminal court would serve no useful purpose” (CPL 210.43 [2] [g], [i] [emphasis added])—leaves sufficient room for courts to consider, in the appropriate case, the evolving social science evidence regarding juvenile development and its effect on the removal determination.
Although defendant does not expressly rely upon People v Rudolph (21 NY3d 497 [2013]) to advance his argument, the concurring opinion by Judge Graffeo in Rudolph succinctly summarizes the social science evidence regarding juvenile development and how courts should treat that evidence. While Judge Graffeo set forth this summary in a case in which the Court of Appeals was deciding whether sentencing courts “must” make a youthful offender determination in every case where a defendant is eligible to be treated as a youthful offender, the summary in Judge Graffeo’s concurrence is also relevant to the removal determination for juvenile offenders, given the interests of justice factors set forth above. In her concurrence, Judge Graffeo stated:
“[S]ociety’s understanding of juvenile brain function and the relationship between youth and un *388 lawful behavior has significantly evolved. As the United States Supreme Court has recognized, ‘developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence’ (Graham v Florida, 560 US 48, 67, 130 S Ct 2011, 2026 [2010]). As compared to adults, sociological studies establish that young people often possess ‘an underdeveloped sense of responsibility,’ which can ‘result in impetuous and ill-considered actions and decisions’ (Johnson v Texas, 509 US 350, 367 [1993]). These developments in the body of knowledge concerning juvenile development underscore the need for judicial procedures that are solicitous of the interests of vulnerable youth, especially under New York’s current youthful offender process in which guilt is determined in the context of a criminal justice system designed for adults. Young people who find themselves in the criminal courts are not comparable to adults in many respects—and our jurisprudence should reflect that fact.” (People v Rudolph, 21 NY3d at 506; see generally Michelle Haddad, Note, Catching Up: The Need for New York State to Amend its Juvenile Offender Law to Reflect Psychiatric, Constitutional and Normative National Trends Over the Last Three Decades, 7 Cardozo Pub L Pol’y & Ethics J 455, 475-483 [summarizing the “Psychological Advances in Understanding Adolescence”].)
Indeed, it is precisely because of the foregoing evolution that New York’s Governor, Andrew Cuomo, created the Commission on Youth, Public Safety and Justice (also known as the “Raise the Age” Commission), saying “[i]t’s time to improve New York’s outdated juvenile justice laws and raise the age at which our children can be tried and charged as adults . . . . New York is one of only two states that charges 16- and 17 year olds as adults” (see Governor Cuomo Announces Members of Commission on Youth, Public Safety & Justice, http:// www.governor.ny.gov/press/04092014-commission-ypsj [accessed Sept. 30, 2014]). Further, legislation has been proposed and is currently pending in the Assembly and the Senate to raise the age of criminal responsibility, which, if enacted, would effectively overhaul portions of the current statutory framework (see 2013 *389 NY Senate-Assembly Bill S1409, A3668 [entitled, “An act to amend the criminal procedure law, the executive law, the family court act and the penal law, in relation to raising the age of criminal responsibility; and to repeal certain provisions of the criminal procedure law, relating thereto”]; see also Jeremy Moule, Young Offenders, Adult Prisons, Rochester City Newspaper, Jan. 22, 2014; Justice Luis A. Gonzalez, Juvenile Justice Reform Must be a Priority, NYLJ Special Reports Newsletter, Jan. 27, 2014; Editorial, Court Reform for Teenage Offenders, NY Times, Oct. 11, 2011; Merril Sobie, Raising the Age: New York’s Archaic Age of Criminal Responsibility, NYLJ, Sept. 4, 2012; Andrew Schepard, Raising New York’s Age of Criminal Responsibility for Juveniles, NYLJ, Jan. 28, 2011).[2]
It is true that this shifting and evolving public opinion cannot justify the wholesale judicial removal of juvenile offender cases to Family Court given the extant statutory framework which mandates an interests of justice examination of various statutory factors. The obvious shifting public opinion as forth above, however, is certainly a relevant and important consideration for the court when examining, as it must, “the impact of a removal of the case to the family court upon the confidence of the public in the criminal justice system,” and “any other relevant fact indicating that a judgment of conviction in the criminal court would serve no useful purpose” (CPL 210.43 [2] [g], [i] [emphasis added]), in defendant’s particular case. Here, the court finds that given the shifting public opinion, the “confidence of the public in the criminal justice system” would be enhanced, not diminished, by removing defendant’s case to Family Court, particularly given the other factors (as set forth below) considered by the court which weigh heavily in favor of Family Court “treatment” of defendant’s “particular case” rather “than continuation of [the] criminal prosecution” (Matter of Vega at 548).
Significantly, removal of defendant’s case to Family Court pursuant to CPL 210.43 would simply mean that the existing *390 robbery charges would be adjudicated at a fact-finding hearing in Family Court, which, if necessary, would also conduct “a dispositional hearing,” considering a “menu” of “dispositional alternatives” which present a “waterfront of possibilities” (Merril Sobie, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 352.2 at 312 [2008 ed]). Under these circumstances, there is really no reason to believe that the public’s confidence in the criminal justice system would be diminished in any way by removing this matter to Family Court (cf. CPL 210.40 [1] [g] [mandating that the Court examine “the impact of (an interests of justice) dismissal upon the confidence of the public in the criminal justice system” (emphasis added)]). And, the People do not really argue otherwise.
The People’s primary objection to removal is that the crime with which defendant is charged, first degree robbery, a class B violent felony offense, is a very serious offense and the case against defendant is strong. Although the People are correct regarding the seriousness of the offense and the strength of their case, the circumstances surrounding the crime indicate that the codefendant, acting as the principal, orchestrated the robbery, and that defendant was the less active participant during the robbery. Further, given the affirmative defense in Penal Law § 160.15 (4), the circumstances surrounding the offense tend to establish that the robbery itself is statutorily a lower felony classification than that charged in the top count of the indictment.
Notably, the element that elevates the robbery offense to a class B violent felony offense is the allegation that defendant “displayed what appeared to be” a pistol or firearm (Penal Law § 160.15 [4]). Yet, at trial that element could be mitigated by the “affirmative defense” in Penal Law § 160.15 [4], since the “air pistol” actually displayed was not loaded, and therefore could not be fairly characterized, by any stretch of the imagination, as “a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged” (see People v Singh, 78 AD3d 1080, 1081-1082 [2d Dept 2010] [where defendant establishes by a preponderance of the evidence that the displayed firearm, “was not loaded,” defendant’s conviction for first degree robbery “must be reduced” to second degree robbery]; see also People v Smith, 55 NY2d 888, 890 [1982] [defendant’s “statement to the effect that the weapon defendant was carrying during the robbery was a toy gun. . . . provided a reasonable basis in the evidence for the jury to *391 conclude that the firearm displayed by defendant was not a loaded weapon from which a shot, readily capable of producing death or other serious physical injury, could be discharged” (internal quotation marks omitted)]). Notably, the availability of the affirmative defense “does not depend on whether the defendant himself is the proponent of the partially exculpatory evidence or whether . . . the evidence emerges in the course of the People’s case” (People v Gayle, 131 AD2d 365, 366 [1st Dept 1987]).
Given the ease with which defendant could establish the affirmative defense in this case under Penal Law § 160.15 (4), it is apparent that the proof adduced at trial would more likely support the charge of robbery in the second degree, a class C violent felony offense (Penal Law § 160.10 [2]), and not robbery in the first degree. Robbery in the second degree, which is already on the indictment, is, of course, the lowest possible felony offense classification with which a juvenile offender may be charged under CPL 1.20 (42).
Under these circumstances, the crime with which defendant is charged, albeit very serious, is statutorily less serious than alleged by the People. And, although defendant’s role in the crime cannot be fairly characterized as being minor since he was the participant who “displayed what appeared to be a pistol,” his role was certainly much less active than the role which his “larger” codefendant played in the commission of the crime. Indeed, it was the codefendant, not defendant, who “stopped” the complainant in her “path,” demanded and took the money and the phone from the complainant, threatened the complainant by telling her that they “knew where she lived,” and threw the phone back at the complainant. By all accounts, it was the co-defendant, not defendant, who was orchestrating this crime and who was acting as the principal, notwithstanding defendant’s display of an unloaded air pistol.
Furthermore, defense counsel also alleges that the codefendant “has repeatedly bullied” defendant, making “threats of violence” against him, and “threatened to beat him up if he did not agree to participate in the instant matter.” Although defense counsel did not substantiate this claim, the court notes that when defendant appeared before the court, leaving his book bag in the gallery, the court personally witnessed the codefendant in the courtroom gallery rifling through defendant’s book bag which contained defendant’s iPad, such that the court had to direct the codefendant to leave the bag alone and be seated *392 elsewhere in the courtroom. Moreover, the codefendant, a juvenile offender who has already pleaded guilty in the instant matter before this court, has been found to be a “juvenile delinquent” in Family Court on two prior occasions. Defendant, on the other hand, has had no prior contact with the juvenile delinquency system or the criminal justice system.
Under these circumstances, the court finds that defendant fits squarely within that class of “juveniles, who are more easily influenced by their companions and their environment than are adults,” warranting the type of “special considerations” to which the legislature “remained sensitive” in enacting the Juvenile Offender Law (Matter of Vega at 548). The court further finds that given the codefendant’s influence upon defendant and defendant’s less active role in the offense, there will be no appreciable “impact ... on the safety or welfare of the community” upon removal of defendant’s matter to Family Court (CPL 210.43 [2] [f]) where a judge of the Family Court would be tasked with choosing from a “menu” of “dispositional alternatives,” including “restrictive placement” under Family Court Act § 353.5.
Although the complainant was not physically harmed during the offense, it is obvious that an offense of this nature—being robbed at apparent gunpoint in broad daylight—is likely to cause enormous emotional and psychological harm to any victim. The complainant, nevertheless, has “show[n] compassion” for defendant who, according to the complainant, “needs supervision.” Indeed, it is telling that when the People in the grand jury asked the complainant about the actions of the “young man” who had the gun, the complainant refused to repeat that term (“young man”), and instead repeatedly referred to defendant and the codefendant as “boys,” “young boys,” or “kids.”[3]
The complainant’s description of defendant as a “young boy” is consistent with the fact that (a) defendant was only 15 years old when the offense occurred, and (b) defendant unquestionably appears younger than his age because of his diminutive *393 stature, which is due to a medical condition that has stunted his growth. Notably, when the court first observed defendant sitting in the courtroom audience on July 7, 2014, the court had the distinct thought that he must be the child or younger brother of one of the defendants on the court’s calendar, and wondered why a parent would permit his own child to witness another family member appearing before the court in handcuffs. As it turned out, this “young boy” was the defendant himself who then appeared before the court on his own robbery case.
Finally, defense counsel alleges that defendant is a special education student (School District 75), and attends a school in Manhattan where he lives with his grandmother and aunt. Although defendant was living with his mother in Far Rockaway when the offense was committed, defendant’s small stature has caused him to be the object of bullying, according to defense counsel, and the family sought to extricate him from the Far Rockaway environment by moving him to Manhattan. Since defendant began attending school in Manhattan, he has been doing well and has had perfect attendance, as verified by his report card. Given the specific needs and conditions of defendant, and the “menu” of “dispositional alternatives” available to judges in Family Court (Merril Sobie, Practice Commentaries, McKinney’s Cons Laws of NY, Book 29A, Family Ct Act § 352.2 at 312 [2008 ed]), the court finds that “no useful purpose” would be served by a criminal court “judgment of conviction” (CPL 210.43 [2] [i]), or “sentence authorized for the offense” (CPL 210.43 [2] [e]).
In short, the court finds that, upon examination of the interests of justice factors in CPL 210.43 (2), removal of defendant’s case to Family Court “would be in the interests of justice” (CPL 210.43 [1] [a]), particularly given defendant’s less active role in the offense, the history and condition of the defendant, the “compassion” expressed by the complainant, the lack of any negative impact upon the safety of the community, and the shifting “confidence of the public” relating to the issue of whether family courts or criminal courts are the more appropriate forum to adjudicate juvenile crime. Defendant’s matter represents the “unusual or exceptional case” which warrants removal to Family Court (Matter of Vega at 553), such that it is “apparent” to this court that Family Court “treatment” of defendant’s “particular case . . . would be more appropriate than continuation of [the] criminal prosecution” (id. at 548).
Accordingly, defendant’s motion for an order removing defendant’s case to Family Court pursuant to CPL 210.43 is hereby *394 granted in all respects. The court shall issue an order of removal and such further orders as may be necessary pursuant to CPL 725.05, on the next adjourned date to effectuate the removal and transfer of the case and file to Family Court.

. Although robbery in the first degree, as charged in the indictment here, is an “armed felony offense” under CPL 1.20 (41) (b) (“display of what appears to be a pistol, revolver ... or other firearm”), the People’s consent is still not required under CPL 210.43 (1) (b) because the indictment does not charge defendant with an “armed felony as defined in” CPL 1.20 (41) (a) since he was not “armed with ... a loaded weapon from which a shot, readily capable of producing death or other serious physical injury may be discharged” (CPL 1.20 [41] [a]). Instead, it is conceded here that defendant displayed an unloaded “black air pistol,” which was also described as an unloaded “black BB gun.”

. Chief Judge Jonathan Lippman has also advocated for the passage of legislation which would increase the age of criminal responsibility (see Mosi Secret, New York Judge Seeks New System for Juveniles, NY Times, Sept. 20, 2011; John Caher, Lippman Urges Increased Age for Adult Prosecution of Teens, NYLJ, Sept. 22, 2011; Andrew Keshner, Lippman Urges Passage of Bill to Up Age of Criminal Responsibility, NYLJ, May 16, 2012; Jeff Storey, Lippman Vows Changes to Confront Doubts About Youth Reform Bill, NYLJ, June 26, 2012; Andrew Keshner, Lippman Pushes for Passage of Reworked Juvenile Justice Bill, NYLJ, Apr. 22, 2013).

. The parties have consented to the court’s review of the grand jury minutes to aid the court in making its interest of justice determination pursuant to CPL 210.43. Further, because the court is granting the motion to remove the matter to Family Court, it will direct in a separate order that the “pleadings and proceedings” in this action, which are deemed to include the “minutes of any grand jury proceeding,” be delivered and filed with the Clerk of the Family Court pursuant to CPL 725.05 (8).