HECHT, Justice
(concurring specially).
“[Cjhildren are constitutionally different from adults.... ” Miller v. Alabama, 567 U.S. -, -, 132 S.Ct. 2455, 2464, 183 L.Ed.2d 407, 418 (2012); see also State v. Lyle, 854 N.W.2d 378, 390, 402 & n. 8 (Iowa 2014); State v. Ragland, 836 N.W.2d 107, 119, 121 (Iowa 2013); Laurence Steinberg, Adolescent Development and Juvenile Justice, 5 Ann. Rev. Clinical Psychol. 459, 481 (2009) [hereinafter Steinberg] (“[A]s a class, adolescents are inherently less blameworthy than adults.”). I join today’s opinion because it recognizes this principle. However, I also write separately because in my view, children are so different that article I, section 17 of the Iowa Constitution categorically prohibits sentencing them to life without parole.
As the United States Supreme Court recognized in Roper v. Simmons, there are significant differences between juveniles and adults that “render suspect any conclusion that a juvenile falls among the worst offenders.” Roper v. Simmons, 543 U.S. 551, 570, 125 S.Ct. 1183, 1195, 161 L.Ed.2d 1, 22 (2005). Juveniles are impetuous; they lack maturity; and they possess an underdeveloped sense of responsibility. See id. at 569, 125 S.Ct. at 1195, 161 L.Ed.2d at 22. Their incomplete maturation makes juveniles especially vulnerable to “negative influences and outside pressures.” Id. This vulnerability is attributable in part to juveniles’ character and personality traits which “are more transitory [and] less fixed” than those of adults. Id. at 570, 125 S.Ct. at 1195, 161 L.Ed.2d at 22. “[Y]outh is more than a chronological fact.” Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1, 11 (1982). “It is a time *559 of immaturity, irresponsibility, ‘impetuousness[,] and recklessness.’ ” Miller, 567 U.S. at -, 132 S.Ct. at 2467, 183 L.Ed.2d at 422 (alteration in original) (quoting Johnson v. Texas, 509 U.S. 350, 368, 113 S.Ct. 2658, 2669, 125 L.Ed.2d 290, 306 (1993)).
For these reasons and others, we recognize that children are constitutionally different because it is impossible to know when they are beyond rehabilitation. See Roper, 543 U.S. at 570, 125 S.Ct. at 1195, 161 L.Ed.2d at 22 (“The reality that juveniles ... struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character.”); see also Miller, 567 U.S. at -, 132 S.Ct. at 2465, 183 L.Ed.2d at 419 (“[T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.”). “[W]e cannot claim that adolescents ‘ought to know better’ if, in fact, the evidence indicates that they do not know better, or more accurately, cannot know better, because they lack the abilities needed to exercise mature judgment.” Steinberg, 5 Ann. Rev. Clinical Psychol, at 471.
Although the Supreme Court initially considered these differences in deciding a case involving the death penalty, it later noted their significance in reviewing sentences of life without parole (LWOP) challenged under the Eighth Amendment. See Graham v. Florida, 560 U.S. 48, 68, 130 S.Ct. 2011, 2026, 176 L.Ed.2d 825, 841 (2010) (“[DJevelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence.”). More recently, the Court considered the importance of the characteristics of youth in reviewing an LWOP sentence imposed on a juvenile offender convicted of homicide. See Miller, 567 U.S. at -, 132 S.Ct. at 2464, 183 L.Ed.2d at 418-19. In Miller, the court struck down as unconstitutional under the Eighth Amendment a mandatory LWOP sentence that was imposed without consideration of the defendant’s “chronological age and its hallmark features— among them, immaturity, impetuosity, and failure to appreciate risks and consequences.” Id. at-, 132 S.Ct. at 2468, 183 L.Ed.2d at 423. The Court also struck down the sentence because it failed to take account of “the family and home environment that surround[ed the defendant] ... no matter how brutal or dysfunctional.” Id. “And finally, th[e] mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it.” Id.
We have concluded juvenile offenders are also different for purposes of sentencing under article I, section 17 of the Iowa Constitution. See State v. Null, 836 N.W.2d 41, 54-56, 70 (Iowa 2013). The majority recognizes as much, but stops short of concluding an LWOP sentence is categorically unconstitutional for offenses committed by juvenile offenders. I am prepared to go there now because I do not believe we can develop or identify a principled standard for predicting which juvenile offenders are capable of maturation and rehabilitation and which ones are not.
My conclusion that article I, section 17 mandates a categorical ban of LWOP sentences for juvenile offenders is based on several considerations. I first note that an LWOP sentence for a juvenile offender is tantamount to a death penalty in the sense that both sentences are based on a conclusive determination that the offender will never be rehabilitated and able to contribute meaningfully to society. See Graham, 560 U.S. at 69, 130 S.Ct. at 2027, 176 *560 L.Ed.2d at 842 (noting either type of sentence “alters the offender’s life by a forfeiture that is irrevocable”); Diatchenko v. Dist. Att’y, 466 Mass. 655, 1 N.E.3d 270, 284 (2013) (“When considered in the context of the offender’s age and the wholesale forfeiture of all liberties, the imposition of [LWOP] on a juvenile homicide offender is strikingly similar, in many respects, to the death penalty-”). Any sentencing scheme that permits such a conclusive determination before the juvenile’s potential for maturation and rehabilitation can be reliably known or predicted is in my view intrinsically disproportionate and therefore cruel and unusual.
I acknowledge the Supreme Court has not yet adopted my position that a categorical ban on LWOP sentences for homicide offenses is constitutionally required.[1] In Miller, the Court only held unconstitutional mandatory LWOP sentences that are imposed without individualized consideration of an offender’s youthful characteristics. Miller, 567 U.S. at -, 132 S.Ct. at 2469, 183 L.Ed.2d at 424 (“[T]he Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders.... [W]e do not consider [the] alternative argument that the Eighth Amendment requires a categorical bar on [LWOP] for juveniles.... ”). The Supreme Court left open the possibility that a juvenile could, consistent with the Eighth Amendment, be sentenced to LWOP, but noted “appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon.” Id. I would reach a different conclusion under article I, section 17 of the Iowa Constitution because I have no confidence that a principled standard can be developed to distinguish an “uncommon occasion” justifying an irrevocable determination of LWOP from other occasions in which a possibility of parole is required.
Other jurists have shared my lack of confidence in our ability to conceive — or in sentencing courts’ ability to apply consistently — a principled standard for identifying the uncommon or rare circumstances justifying LWOP for a juvenile offender. See Graham, 560 U.S. at 77, 130 S.Ct. at 2032, 176 L.Ed.2d at 847 (doubting “that courts taking a case-by-case ... approach could with sufficient accuracy distinguish the few incorrigible juvenile offenders from the many that have the capacity for change”); Roper, 543 U.S. at 573, 125 S.Ct. at 1197, 161 L.Ed.2d at 24 (“It is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.”); Diatchenko, 1 N.E.3d at 284 (noting that when sentencing juveniles, “the judge cannot ascertain, with any reasonable degree of certainty, whether imposition of th[e] most severe punishment is warranted”). “[E]ven for juveniles who commit murder, their moral culpability compared to adults remains diminished by their age ..., and they, therefore, are still less deserving, as a categorical matter, of the most severe punishments.” Mary Berkheiser, Developmental Detour: How the Minimalism of Miller v. Alabama Led the Court’s “Kids Are Different” Eighth Amendment Jurisprudence Doum a Blind *561 Alley, 46 Akron L. Rev. 489, 501-02 (2013) [hereinafter Berkheiser]; see also Aryn Seiler, Note, Buried, Alive: The Constitutional Question of Life Without Parole for Juvenile Offenders Convicted of Homicide, 17 Lewis & Clark L. Rev. 293, 321 (2013) (“[T]he culpability of the juvenile offender is diminished in the homicide case just as it is diminished in the non-homicide case. Culpability belongs to the offender, not the offense.”).
Let us suppose that any standard for identifying an “uncommon” case justifying LWOP might call for consideration of the heinous nature of the juvenile offender’s crime. This factor is problematic for multiple reasons. First, as the Supreme Court has noted, “[a]n unacceptable likelihood exists that the brutality or coldblooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course.” Roper, 543 U.S. at 573, 125 S.Ct. at 1197, 161 L.Ed.2d at 24. But even more problematic in my view is the fact that the heinousness of a juvenile’s crime is likely to be causally connected with the very attributes and disabilities of youth which cause some folks to cringe at the prospect of LWOP sentences for juvenile offenders. As this court has previously noted, juveniles often fail to appreciate risks and are susceptible to peer pressure; they tend to act impetuously without contemplating the consequences of their behavior. See Null, 836 N.W.2d at 54-56. Thus, the very attributes and disabilities making youth constitutionally different are causal factors increasing the likelihood of heinous behavior. Accordingly, I think it cannot be sensible to suggest that a principled standard for identifying the uncommon case deserving LWOP should include the heinousness of a juvenile offender’s crime.
Other potential factors that might be considered in any standard for identifying the uncommon case suitable for an LWOP sentence are similarly problematic. Consider, for example, the juvenile offender’s age. Do we really believe a sentencing court can make a principled distinction between an offender who is fifteen years old and another who is seventeen years old in assessing relative capacities for maturation and rehabilitation? Given what we now know about the incompleteness of brain development during adolescence, I believe the court’s ability to predict such capacities of juvenile offenders is largely based on sheer speculation at either age.
Another sentencing consideration commonly included in the analysis of whether LWOP might be appropriate for a juvenile offender convicted of homicide is whether the offender experienced severe abuse or neglect as a child. But should a juvenile offender’s history of horrific abuse or neglect augur in favor of or against LWOP when he or she is sentenced for a homicide? The juvenile offender with such a history of deprivation might be viewed as less culpable than another who was raised in a stable home with caring parents. Yet, the horrifically deprived and abused juvenile offender might have been so deeply scarred by the circumstances of his or her young life that rehabilitation might be a very doubtful and distant prospect.
I suggest the picture is no clearer in the case of the juvenile offender who was raised in a stable home with caring parents. Should the sentencing court conclude this offender found guiity of homicide is more culpable than the child whose family life was characterized by chaos and deprivation? Perhaps; but even if the sentencing court views him as morally more blameworthy, might he nonetheless have better prospects for maturation and rehabilitation because he does not carry the deep scars of deprivation — and might he therefore be a better candidate for pa *562 role than our less fortunate hypothetical offender? No matter how the sentencing court might answer these extremely challenging questions, it cannot predict with reasonable certainty which juvenile offender will in fact mature and develop the capacity to become a contributing member of society. Only time will tell.
History shows us that some juvenile offenders convicted of homicide make remarkable progress toward maturity and rehabilitation over time during incarceration. To illustrate this phenomenon, one need only look to State v. Louisell, 865 N.W.2d 590, 2015 WL 3930172 (Iowa 2015), also decided today. Louisell endured a difficult and chaotic childhood before attending college in Iowa beginning in 1987. Id. at 593. She was convicted of first-degree murder after befriending an older, physically handicapped art student, stabbing him in his home, and stealing his wallet. Id. at 593. A jury found she committed a premeditated and deliberate crime. Id. at 584; see Iowa Code § 707.2(1) (1987). Yet, during her time in prison, Louisell earned an associate’s degree and a bachelor’s degree, learned a trade, became a published author, and became a mentor and tutor for other incarcerated women. Louisell, 865 N.W.2d at 594. In 1988, when Louisell was sentenced to LWOP, few if any participants in the . proceedings would have predicted Louisell would shed the disabilities of youth given the nature of her crime. Yet, her accomplishments since then demonstrate that an LWOP determination should not focus on missed opportunities to mature during childhood and adolescence, but on the possibility that a juvenile offender convicted of the most serious of offenses might capitalize on future ones while in prison. Because an irrevocable LWOP determination by a sentencing court is fraught with so much uncertainty attending the juvenile offender’s potential for maturation and rehabilitation, I conclude article I, section 17. mandates prohibition of LWOP sentences for all juveniles convicted of homicide offenses.
Some have contended LWOP should remain available as a sentencing option for juvenile offenders convicted of homicides committed after thinking and planning. See People v. Carp, 496 Mich. 440, 852 N.W.2d 801, 843 (2014) (“Because some juvenile offenders ... form an unequivocal premeditated intent to kill in the face of the consequences, it is not categorically disproportionate to punish at least some juvenile offenders the same as adults.”). To be sure, the circumstances of Seats’s crime suggest he engaged in some deliberation before committing the offense in this ease. He knew his friend had a gun, arranged transportation to the victim’s residence, and acted at night when the victim would likely be sleeping. These facts are certainly chilling, just like the facts in Roper. See Roper, 543 U.S. at 556-57, 125 S.Ct. at 1187-88, 161 L.Ed.2d at 13 (noting the defendant instigated a plan to commit burglary and murder, acted at night, and threw the victim off a bridge after wrapping her face in duct tape). “But the Constitution does not permit subjective gut reactions to define the sentencing of our young.” Berkheiser, 46 Akron L. Rev. at 508.
Furthermore, the circumstances of Seats’s crime also highlight the frailty of juvenile reasoning and the undeveloped juvenile capacity to understand the horrible and permanent consequences of behavior. See Steinberg, 5 Ann. Rev. Clinical Psy-chol. at 467 (“[D]espite the fact that in many ways adolescents may appear to be as intelligent as adults ..., their ability to regulate their behavior in accord with these advanced intellectual abilities is more limited.”). Seats worried that he would be reported for committing a crime, *563 so he decided to commit another, more serious crime. He acted so impetuously that he did not even verify he had encountered his intended victim before firing multiple shots. He contacted a police investigator because he “had heard” he was a suspect in the murder and wanted to clear his name, apparently believing his friendly outreach would remove any suspicion the police otherwise had. I recognize there is no assurance that these traits will resolve as Seats ages and matures. Nonetheless, I believe no sentencing court should be able to deprive him of an opportunity, at some point in the future, to demonstrate that they have. See Graham, 560 U.S. at 79, 130 S.Ct. at 2032, 176 L.Ed.2d at 848 (“Maturity can lead to that considered reflection which is the foundation for remorse, renewal, and rehabilitation”).
One other state — Massachusetts—has already determined that juvenile LWOP sentences are categorically prohibited under its state constitution. Diatchenko, 1 N.E.3d at 284-85 (“[W]e conclude that the discretionary imposition of [LWOP] on juveniles who are under the age of eighteen when they commit murder in the first degree violates the [constitutional] prohibition against ‘cruel or unusual punishment’ .... ”). In doing so, the Supreme Judicial Court of Massachusetts relied on two analytical pillars I would adopt here: first, that the “back end” parole board mechanism better accommodates juveniles’ capacity for change than a “front end” irrevocable LWOP determination; and second, that juveniles have diminished culpability no matter the offense they commit. See id. at 282-85. Iowa should join Massachusetts on the path it has forged.[2]
Juvenile justice evolves in incremental steps. See State v. Pearson, 836 N.W.2d 88, 99 (Iowa 2013) (Cady, C.J., concurring specially). Given the foundation of diminished juvenile culpability and the reasoning set forth in Roper, Graham, Miller, Diatchenko, and our decisions based on article I, section 17 of the Iowa Constitution, the categorical rule I propose in this case is merely the final increment. Because children are constitutionally different, I believe a sentence of life without parole “may not be imposed on [them] ... no matter how heinous the crime.” Roper, 543 U.S. at 568, 125 S.Ct. at 1195, 161 L.Ed.2d at 21. Accordingly, I concur in my colleagues’ determination that Seats must be resentenced.

. A petition for certiorari currently before the Supreme Court raises that question in part; the question presented is whether "the Eighth Amendment's ban on cruel and unusual punishment forbid[s] sentencing a child to [LWOP] when that child has been convicted of felony murder despite not having killed or intended to kill.” Petition for Writ of Certiorari at i, Davis v. Michigan, No. 14-8106 (U.S. Jan. 20, 2015). Although Davis only involves a subcategory of homicide offenses, it nonetheless establishes that this issue continues to arise.

. Some other states have legislatively abolished LWOP for juveniles. See, e.g., Haw.Rev. Stat. Ann. § 706-656(1) (West, Westlaw through June 3, 2015) ("Persons under the age of eighteen years at the time of the offense who are convicted of first degree murder or first degree attempted murder shall be sentenced to life imprisonment with the possibility of parole.”); W. Va.Code Ann. § 61-11-23(a)(2) (West, Westlaw through 2015 Reg. Sess.) ("Notwithstanding any other provision of law to the contrary, a sentence of [LWOP] may not be imposed on a person who ... [w]as less than eighteen years of age at the time the offense was committed.”); Wyo. Stat. Ann. § 6-2-101(b) (West, Westlaw through 2014 Budget Sess.) (“A person convicted of murder in the first degree shall be punished by death, life imprisonment without parole or life imprisonment according to law, except that a person convicted of murder in the first degree who was under the age of eighteen (18) years at the time of the offense shall be punished by life imprisonment.”); see also Tex. Penal Code Ann. § 12.31(a) (West, Westlaw through 84th Legis., ch. 46 of 2015 Reg. Sess.) (distinguishing between "life” for juvenile offenders and "life without parole” for adult offenders).