**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2359-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JASON BAKER,

     Defendant-Appellant.

_____

Argued December 5, 2024 – Decided December 19, 2024

Before Judges Mawla, Natali, and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Cumberland County, Indictment No. 94-06-0667.

Lucas B. Slevin, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer Nicole Sellitti, Public Defender, attorney; Lucas B. Slevin, of counsel and on the briefs).

Kimberly P. Will, Assistant Prosecutor, argued the cause for respondent (Jennifer Webb-McRae, Cumberland County Prosecutor, attorney; Kimberly P. Will, of counsel and on the brief).

Defendant Jason Baker appeals from a March 31, 2023 judgment, which re-sentenced him to a term of life imprisonment with twenty-nine years of parole ineligibility for a felony murder and purposeful and knowing murder he pled guilty to as a minor in 1995. We reverse and remand for further findings and reconsideration for the reasons expressed in this opinion.

On defendant's last appeal, we recounted the facts associated with his heinous crimes as follows:

> Defendant [and two co-defendants, one of whom was Luis Beltran,] murdered an elderly couple during a home invasion burglary on March 2, 1994. Before breaking into the isolated home through a basement window, [Beltran] cut wires he believed activated a burglar alarm system, and almost immediately shot the wife four times, execution-style. The group dragged the victim's body down the stairs and left her in a corner of the basement. The victim's husband returned home some forty-five minutes later. [Defendant] shot twice, striking the husband's cheek with the second bullet. The husband fled the house and ran down the driveway, attempting to escape. The burglars gave chase. When they caught him, one of them smashed the husband's head with the butt of the gun, knocking him down to the ground, before the group kicked and beat him. The trio dragged the husband back into the house where they stabbed and pummeled him to death. The medical examiner found the husband suffered twenty-seven separate injuries, including thirteen cut wounds, four tear wounds, four fractured ribs, a bullet wound, and numerous defensive wounds. [Defendant was] prosecuted as [an] adult . . . .

2

> [State v. Baker, Nos. A-2961-18, A-5023-18 (App. Div.
> Feb. 4, 2022) (slip op. at 3).]

After Beltran was tried and convicted of numerous offenses, defendant pled guilty to felony murder and murder, and negotiated two life terms with a thirty-year period of parole ineligibility.  Id. at 3-5.  The trial judge granted the State's request for consecutive terms.  Id. at 5.

On appeal from the denial of defendant's third petition for post-conviction relief (PCR), we remanded for resentencing pursuant to State v. Zuber, 227 N.J. 422 (2017).  Thereafter,

> on September 4, 2018, a different judge[1]conducted an extensive sentence hearing.  Defendant[] submitted . . . psychological evaluations, testimony from [his] psychologist, statements from the victims' family, and statements from defendant['s] famil[y].  Defendant[] demonstrated that [he] had not committed infractions in prison for many years, obtained several certifications and diplomas, and enjoyed [his] . . . famil[y's] support.
>
> . . . .
>
> [T]he judge thoughtfully reviewed the information presented at the hearing, the trial, and the first sentencing. . . .
>
> [H]e found aggravating factor one.  He also found aggravating factors three and nine.  The judge did not believe Beltran had been the "ringleader," but

---

[1]  Because the trial judge had retired, the sentencing judge whose March 2023 judgment we review in this opinion, conducted the 2018 sentencing hearing.

A-2359-22

characterized the crime as a "collaborative effort."  He even called [defendant] the "precipitator of the action against [the husband]."  [Defendant] shot the newly widowed husband in the face, in his own home, from two feet away.  [Defendant] then chased the husband down the driveway, beat him with the gun, knocked him to the ground, "and . . . kicked him in the head and stomped on him . . . ."  [Defendant] and his cohorts carried the husband back inside his home, stomped him some more, then ended his life by stabbing him multiple times with his own kitchen knives.

The judge reiterated that this was not the typical situation where, for instance, a convenience store clerk is shot incidental to juveniles committing a theft. . . . While [defendant] appeared more mature than Beltran, approaching rehabilitation, the judge had concern about his psychological profile, including his history of animal abuse.  Unlike Beltran, who grew up in an unfavorable environment, the judge expressed fears that "there's something else going on with . . . [defendant]."

In sum, the judge concluded, after thoughtful consideration of the evidence, that the only thing that had meaningfully changed since the original sentencing was the law–not the fundamental character of defendant[].

[Baker, slip op. at 6-10 (eleventh, twelfth, thirteenth, and fifteenth alterations in original).]

In the last appeal, defendant argued the sentencing judge failed to follow Zuber and address whether defendant had rehabilitated and should be sentenced to a term that would allow for his release.  Id. at 10.  Beltran asserted the

mandatory minimum of thirty years parole ineligibility on the murder convictions was unconstitutional pursuant to Zuber and Miller v. Alabama, 567 U.S. 460 (2012). Id. at 11. We noted the advent of State v. Comer, 249 N.J. 359 (2022) mooted, in defendants' favor, the constitutional argument regarding the mandatory minimum. Id. at 12.

We addressed the similarities and differences between defendant's case and Comer. Defendant was a juvenile like the defendant in Comer. Ibid. Here, however, "the double-murder home-invasion burglary [did] not appear to be an example of children 'lack[ing] maturity and responsibility . . . .'" because "[d]efendants intended to commit murder" and "[t]he victims were not slain incidental to the burglary." Ibid. (second and third alterations in original).

Regardless, we found Comer provided a sentencing alternative and the sentencing "judge must again consider the Miller factors to determine whether defendant[ has] been rehabilitated and [is] more cognizant of the risks and consequences of [his] actions." Id. at 12-13. We added that "[a]lthough the judge found neither defendant rehabilitated, he found neither to be incorrigibly corrupt. For that reason, we remand[ed] the matter again for fresh consideration of the sentence in light of Comer." Id. at 13. Due to "the lapse of time since the last resentencing hearing," we held defendants were "entitled to present up-to-

date proofs regarding their conduct in the state prison system, or any other information they consider pertinent to their personal development or to prove rehabilitation." Ibid.

We expressed no opinion as to the proper outcome of the resentencing, but noted Comer permitted minors the opportunity to present evidence showing they have matured and rehabilitated to try to prove they can reenter society. Ibid. At the same time, Comer observed the "brutal nature of the offense can 'overpower mitigating arguments based on youth.'" Ibid. (quoting Comer, 249 N.J. at 400). Comer mandates that in undertaking the resentencing "the court must 'consider the totality of the evidence[,]' and 'explain and make a thorough record of [its] findings to ensure fairness and facilitate review.'" Id. at 14 (alteration in original) (quoting Comer, 249 N.J. at 400, 404).

At the resentencing hearing, defendant relied on the previous expert testimony and report submitted on his behalf in 2018. The expert opined defendant had been raised in a supportive setting. Although he had a "history of traumatic brain injuries with delayed childhood development with aggression . . . [the c]urrent psychological testing and his prison record suggest[ed] that his aggressive propensity has resolved." Defendant "established a pro-social attitude hallmarked by consistent work performance, attaining his high school

diploma, and participation in a variety of prison programs over the years. There [was] no known history of aggression during his nearly three decades of incarceration."

The psychological testing showed "no measured indications of severe psychopathology." The expert concluded defendant "present[ed] a low risk for community supervision problems. Intellectual testing shows a person capable of understanding the challenges of a changed world. His prison work record indicates ability to get and keep responsible employment." The expert concluded defendant had "matured psychologically and intellectually over the past [forty-one] years . . . [and was] capable of connecting his thoughts, feelings, and behaviors in a consistent and adult like manner. He is demonstrating the adult capacity for change often observed with adolescent offenders." Defendant "evolved beyond the adolescent criminal recklessness that characterized his life before sentencing in 1995. There are strong indications that his maturation and development will continue."

The expert concluded defendant, who was forty-six years old at the time, "is capable of returning to the community and complying with its laws and norms. There are no indications that he presents as an incorrigible individual requiring additional incarceration." Additionally, defense counsel noted

7

defendant had: repeatedly expressed his remorse; only one early infraction in prison for possessing a tattoo pen; completed trainings and mentored young inmates; and received thank you letters from prison officials for his work in the metal shop, where he was entrusted with sharp tools.

The State requested the court impose two concurrent life sentences, with a parole eligibility period of thirty years. Defendant asked to be resentenced to a fixed term of forty years, with a mandatory term of thirty years in lieu of the life sentence. The sentencing hearing occurred in March 2023. Defendant was also approaching parole eligibility as he approached thirty years of incarceration. He was later denied parole.

The sentencing judge found defendant had matured chronologically from seventeen to forty-six years of age. There was a "substantial difference" in how defendant approached the court from the previous re-sentencing in 2019. He found the difference was not maturity but intelligence, meaning that defendant changed his approach and presentation "with the benefit of the decisions that have come down" from the sentencing court and "higher courts . . . ." Defendant "adapt[ed,]" "change[d,]" and "present[ed]" his case differently. The judge said he would not be convinced that defendant was substantially different from the last time he was re-sentenced. Although the judge acknowledged that "[c]ourts

8

have told me not to get too caught up in the heinousness of" defendant's offenses, he found that, even with the benefit of aging, defendant was the same person he was when he committed the offense at seventeen years old because "even your normal incorrigible [seventeen] year old would never even imagine doing" what defendant did.

The sentencing judge reasoned defendant's maturity was because he had to adapt to prison life and defendant had not really matured. The judge recounted the fact defendant had presented the same psychiatric report as the last re-sentencing which contained disturbing information about "harming of animals . . . ." Defendant had one infraction in prison in 1996 and a less extensive juvenile record than Beltran. The underlying offenses were committed in collaboration with Beltran, rather than because of Beltran's influence. The murders were not the product of "impetuousness of youth or . . . not understanding." They were planned and not simply a crime of opportunity—the defendants waited for the second victim to come home. Although defendant presented some evidence of a difficult childhood, it did not explain his crimes. The judge noted: "People do[] far less things having far worse childhoods than that."

A-2359-22

The sentencing judge discounted defendant's rehabilitation. He reasoned defendant had refrained from committing further crimes because he is "in an environment full of people who are very capable of defending themselves. . . . [He is] not dealing with vulnerable individuals. [He is] in a much more controlled environment . . . ." When defense counsel pointed out the case law required the court to nonetheless consider a defendant's conduct in the controlled environment of prison, the judge declared the guidance of Zuber and Miller were "rudimentary at best" because he could not "see into someone's soul." Moreover, he had already considered these cases in the prior re-sentencing.

The sentencing judge reassessed the Miller factors. He found defendant was under eighteen at the time of the offense and failed to appreciate the consequences of his actions. The judge gave weight to the fact defendant "had a far more acrimonious childhood" than Beltran. Defendant was an equal participant in the underlying offenses, which were heinous, planned, and "unnecessarily violent."

Defendant's youth had no impact on his appreciation of the criminal justice process. The judge noted he waited to see what happened to Beltran at trial before entering a plea. "He did not fail to assess or cooperate with his defense or comprehend what he should be doing."

The judge stated it was "almost impossible for [him] to determine how [defendant is going to] react . . . when and if [he is] released back into society." Although defendant was mature and had grown older, the judge did not know whether his "approach to freedom is any different than it was before other than the fact that [he is] not [seventeen] anymore [and cannot] do the things [he] used to do."

Turning to Comer, the sentencing judge found defendant's punishment conformed with and was not disproportionate to his crimes, particularly because the court changed the sentence from consecutive to concurrent, making it "basically two homicides for one." The judge found defendant's sentence did not go "beyond what is necessary to accomplish any legitimate penological objectives" because defendant had a meaningful opportunity at parole. Parole would offer "a more in depth look than the [c]ourt can actually give in . . . this type of proceeding."

The sentencing judge found aggravating factor one, N.J.S.A. 2C:44-1(a)(1), for the same reasons as in the prior re-sentencing. He gave the factor substantial weight because defendant's offense was "[u]nnecessarily violent. It was not motivated by outside influences nor was it the impetuousness of youth. This was just plain evil." The judge continued to give aggravating factor three,

N.J.S.A. 2C:44-1(a)(3), substantial weight because "nothing here . . . would indicate . . . that under similar circumstances outside of the control of the [prison] facility that [defendant] would not . . . re-offend." Although defendant had less of a record than Beltran, "he had a record nonetheless."

Aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), applied because although there was "some acknowledgment or understanding [of] the wrongness of what was done . . . the context in which [the crimes were committed] was so unnecessary and it was so preplanned that deterrence" was required because the crime was not the product of "the impetuousness of youth [and] was not a youthful offense." Aggravating factor twelve, N.J.S.A. 2C:44-1(a)(12), applied because the victims were older and vulnerable, and defendant "knew that[,] . . . planned it[, and] staked it out."

Unlike the prior re-sentencing, the judge gave substantial consideration to mitigating factor fourteen, N.J.S.A. 2C:44-1(b)(14). He found "there was some lack of understanding how much trouble you could get into doing something like this and . . . that had some play here."

The sentencing judge concluded the aggravating factors substantially outweighed the mitigating factor. There was a presumption of incarceration for first-degree crimes, which was not overcome by the Comer, Miller, or Zuber

12

factors.  Given "the nature and circumstances of the offense and the history, character, and conditions of [defendant,] . . . imprisonment is necessary for protection of the public."  The judge also noted defendant had voluntarily negotiated his plea, but then "spent several years trying to undo" it.

The sentencing judge concluded he could not issue the same sentence because <u>Comer</u> eliminated the thirty-year mandatory parole ineligibility. However, the fact that defendant demonstrated "some maturity" and had not "been the worst inmate[]" was a consideration for parole.  The judge sentenced defendant to concurrent life terms reasoning "[y]ou [cannot] commit an act like this and not go under a life sentence . . . the youthfulness doesn't rise to a level that would not make this an offense punishable by life."  He reduced defendant's parole ineligibility from thirty to twenty-nine years.

Defendant raises the following points on appeal:

> POINT I.  IN RE-SENTENCING DEFENDANT PURSUANT TO . . . <u>COMER</u>, THE COURT COMMITTED FOUR INDEPENDENT LEGAL ERRORS.  IN SO DOING, THE COURT FAILED TO RULE ON THE BOTTOM-LINE ISSUE OF WHETHER DEFENDANT HAD MATURED AND REHABILITATED.  ACCORDINGLY, THE MATTER MUST BE REMANDED AGAIN FOR RESENTENCING.

A. The court refused to consider [d]efendant's exemplary conduct while incarcerated as evidence of rehabilitation.

B. The court erred in its application of all five Miller factors.

> i. The court failed to properly apply Miller factor [one] (immaturity) by erroneously concluding that [d]efendant's actions as a teenager were not influenced by his immaturity, and by improperly disregarding expert psychological testimony indicating that [d]efendant had matured since his original sentencing.

> ii. The court failed to properly apply Miller factor [five] (rehabilitation) by disregarding expert psychological testimony indicating that [d]efendant has rehabilitated.

> iii. The court failed to properly apply Miller factor [two] (family and environment) by conducting a comparative rather than individualized analysis of [d]efendant's childhood environment, and by disregarding expert psychological testimony indicating that [d]efendant's traumatic childhood influenced his reckless behavior.

> iv. The court failed to properly apply Miller factor [three] (circumstances of offense and peer pressure) by incorrectly focusing on the heinousness of the offense, and by failing to consider the expert psychological testimony indicating

14

[d]efendant was uniquely susceptible to peer pressure.

v. The court failed to properly apply Miller factor [four] (capacity to work within legal system) by speculating that because [d]efendant pled guilty, he was necessarily capable of working productively within the legal system.

C. The court's analysis of the statutory sentencing factors disregarded expert psychological testimony, and relied upon facts not supported by the record. Accordingly, the court erred by finding aggravating factors [three] and [nine], and by declining to find mitigating factors [seven], [eight], and [nine].

D. The court erroneously found that relief under Comer is limited to eligibility for parole, and thereby refused to even consider altering [d]efendant's original base sentence of life imprisonment.

POINT II. THE REMAND PROCEEDINGS SHOULD OCCUR BEFORE A DIFFERENT JUDGE. (Not raised below).

I.

We review the imposition of a sentence under an abuse of discretion standard. State v. Torres, 246 N.J. 246, 272 (2021). Under this standard, we should defer to the sentencing court's factual findings and should not "second-guess" them. State v. Case, 220 N.J. 49, 65 (2014).

15

We "affirm the sentence of a trial court unless: (1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" State v. Bolvito, 217 N.J. 221, 228 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).

## II.

Comer recounted the history of cases from both the United States Supreme Court and our own Supreme Court regarding juvenile sentencing and the differences from adult sentencing. 249 N.J. at 384-403. The Court concluded that "[t]aken together, the differences tell us that a juvenile's 'irresponsible conduct is not as morally reprehensible as' the behavior of an adult." Id. at 385 (quoting Johnson v. Texas, 509 U.S. 350, 367 (1993)). In recognition of this fact, Comer noted the United States Supreme Court in Miller banned "life-without-parole sentences for juveniles to homicide offenses." Id. at 386 (citing Miller, 567 U.S. at 465). This is because the Court in Graham v. Florida, 560 U.S. 48 (2010) held that although "states are 'not required to guarantee eventual freedom to a juvenile offender . . .' they may not 'ma[ke] the judgment at the outset that' a youthful offender will never 'be fit to reenter society.' Instead,

16

states must 'give defendants . . . some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" Comer, 249 N.J. at 386 (alteration and second omission in original) (internal citations omitted).

In Zuber, our Supreme Court "extended Miller to sentences that are the practical equivalent of life without parole." Id. at 388 (citing Miller, 567 U.S. at 429). Zuber "requires judges to evaluate the Miller factors before sentencing juveniles to a lengthy term of parole ineligibility." Ibid. In State v. Thomas, we pointed out that "[i]n Miller, the Court noted that 'adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance.'" 470 N.J. Super. 167, 181 (App. Div. 2022) (quoting Miller, 567 U.S. at 472 n.5). The five so-called Miller factors to be considered by sentencing judges include:

> [A juvenile's] chronological age and its hallmark features–among them, immaturity, impetuosity, and failure to appreciate risks and consequences. . . . [T]he family and home environment that surrounds [them]– and from which [they] cannot usually extricate [themself]–no matter how brutal or dysfunctional. [T]he circumstances of the homicide offense, including the extent of [the juvenile's] participation in the conduct and the way familial and peer pressures may have affected [them]. . . . [Whether the juvenile] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth–for example, [their] inability to deal with police officers or prosecutors (including on a plea agreement) or [their]

17

incapacity to assist [their] own attorneys. And . . . the possibility of rehabilitation even when the circumstances most suggest it.

[Id. at 181-82 (quoting Miller, 567 U.S. at 477-78).]

Comer noted that a juvenile's: maturity; impetuousness; ability to appreciate the risks and consequences of their actions; character; and competency, "appl[ied] generally to juveniles; they are not crime-specific." 249 N.J. at 394.

Other relevant observations made by Comer, included that "courts cannot determine at the outset that a juvenile will never be fit to reenter society." Ibid. "[I]t is difficult even for experts to assess whether a juvenile's criminal behavior is a sign of transient immaturity or irreparable corruption. . . . In other words, they must be given a chance to show they are fit to reenter society." Id. at 395 (internal citations omitted).

Comer held a thirty-year parole bar did not conform with contemporary decency standards and raised concerns whether it constituted an especially harsh punishment for juveniles. Id. at 396-97. This is because a juvenile's lack of maturity "can lead to 'ill-considered actions,' because they 'are more vulnerable to negative influences and outside pressures,' and because their character 'is not as well formed' as an adult's, their misconduct is not as morally culpable as an adult's[,]" thereby making their punishment "grossly disproportionate to the

18

underlying offense." Id. at 397-98 (quoting Roper v. Simmons, 543 U.S. 551, 569-70 (2005)).

Comer also observed that "because of the diminished capacity of juveniles, the traditional penological justifications–retribution, deterrence, incapacitation, and rehabilitation–'apply . . . with lesser force than to adults.'" Id. at 398 (omission in original) (quoting Roper, 543 U.S. at 571). Indeed, youth and immaturity diminish the culpability and blameworthiness of a juvenile. Ibid. "Juveniles are still responsible for their actions, but their transgression 'is not as morally reprehensible as that of an adult.'" Id. at 398-99 (quoting Graham, 560 U.S. at 68). Juveniles are less susceptible to deterrence because the characteristics, which render them less culpable than adults make them "less likely to take possible punishment into account when making impulsive, ill-considered decisions that stem from immaturity." Id. at 399.

Comer noted experts "cannot predict whether a juvenile's criminal behavior 'reflects unfortunate yet transient immaturity' or the 'rare' situation of a minor who is 'irreparabl[y] corrupt[].'" Ibid. (alterations in original) (quoting Roper, 543 U.S. at 571). The Court cited research on the age-crime curve, which showed "most juveniles desist from crime before [thirty] years have passed from

19

the time of their offense." Ibid. This militated against incarcerating juveniles "for several decades to protect the public." Id. at 400.

Comer also rejected the thirty-year period of mandatory parole ineligibility because a juvenile's brain matures as they grow older, including parts of the brain involved in impulse control. Ibid. The Court noted "juveniles are also more capable of change than adults[,]" and "notwithstanding rehabilitative services in jail, individuals who serve lengthy prison terms often face greater challenges reintegrating into society." Ibid. Therefore, rehabilitation did not "justify mandatory minimum sentences of [thirty] years for juveniles regardless of the individual facts and circumstances of a case." Ibid.

The Court struck down the mandatory thirty-year parole ineligibility for juveniles. It held juveniles could "petition the court to review their sentence after [twenty] years" and should have the opportunity "to show they have matured, to present evidence of their rehabilitation, and to try to prove they are fit to reenter society . . . ." Id. at 401.

A.

In Point I, defendant argues the sentencing judge disregarded Comer by failing to consider his exemplary conduct during his incarceration as evidence

20

of his rehabilitation and maturation.[2]   Rather than analyze defendant's characteristics, the judge focused on the characteristics of the controlled prison environment, disregarding defendant's rehabilitation.   Defendant claims the judge's ruling nullifies <u>Comer</u> because no incarcerated person could point to their good conduct in prison to prove rehabilitation.   Moreover, defendant's psychological expert opined prison life is more challenging than life in the community and defendant's exemplary conduct in prison is "a particularly strong indicator that he will succeed in [a] comparatively less strenuous environment once released."

Defendant asserts the sentencing judge misapplied and refused to apply some of the <u>Miller</u> factors.   Like his argument regarding <u>Comer</u>, defendant asserts the judge misapplied the first <u>Miller</u> factor by disregarding the expert testimony showing defendant had matured.   Defendant notes the State produced no experts and the only evidence in the record was from defense experts, who testified at trial that he had developmental and neurological deficits, which made

---

[2]  Amici, the Public Defender's Association join in this argument.   They also assert the State improperly argued defendant lacked remorse because he brought PCR petitions.   They note the record is replete with defendant's expressions of remorse, which the sentencing judge should have credited as mitigation evidence of rehabilitation.   Therefore, "the record unquestionably established [defendant's] maturation, remorse, and rehabilitation."

21

him uniquely immature. Therefore, the State failed to overcome the presumption defendant was immature at the time of his offenses, and the judge should have considered this in mitigation.

Defendant alleged the judge also misapplied the first Miller factor when he failed to consider whether defendant still possessed the hallmark qualities of youth by crediting his behavior in prison and the psychological testimony, which evidenced his maturation. Instead, the judge remarked he did not spend a lot of time reviewing the psychological evidence and focused on one mention in a psychiatric report of defendant harming an animal when he was eleven years old as evidence of his lack of maturity. Had the judge reviewed the psychological evidence, he would have read that the expert found defendant had "reflected on the consequences [of the offense and] . . . established a pro-social attitude" evidenced by his work, schooling, and participation in programs.

Although the sentencing judge acknowledged the law required him to focus on defendant's conduct since he committed his offenses, he found defendant to be the exception because of the "heinous manner" in which he "earned [his] way into [the] system . . . ." Defendant argues this contravened Comer, which instructs that the "brutal nature of an offense [must not]

'overpower mitigating arguments based on youth.'" 249 N.J. at 403 (quoting Roper, 543 U.S. at 573). Amici joins in this argument as well.

Defendant claims the sentencing judge also misapplied Miller factor five by refusing to consider his prison conduct as evidence of rehabilitation. This included ignoring the psychological expert's testimony showing defendant had learned to control his impulses, resolved his aggressive propensity, and was "capable of returning to the community and complying with its laws and norms." Defendant asserts the judge's finding that it was "almost impossible for [him] to determine how [defendant is going to] react . . . if [he is] released back into society" was proof he ignored the psychological evidence.

The sentencing judge also erred in applying Miller factor two and failing to consider the impact of his environment on his decision to offend. Defendant notes the defense presented testimony from two doctors at trial showing defendant experienced considerable emotional and physical violence in his household growing up, leading him to be hospitalized on one occasion. The medical testimony further showed he lacked emotional support and positive role models as a child, and was exposed to parental substance abuse and domestic violence. The experts described defendant as a "ticking time bomb" and "extremely disturbed and [in] need[ of] remedial help immediately." Having not

23

received that help, defendant "turned to what had become a negative peer group to give him the support he needed" and "found himself influenced and coerced by others, including the two individuals who were involved in the slaying of the [victims] . . . ."

Defendant argues this evidence did not support the judge's finding that "there was some abuse . . . in his upbringing [but it was] not the worst [he has] seen here . . . . People do[] far less things having far worse childhoods than that." Moreover, the judge relied on evidence outside of the record comparing defendant to other juvenile offenders and ignored Comer's instruction to "assess a juvenile's individual circumstances . . . ." 249 N.J. at 401.

Defendant contends the sentencing judge's findings under Miller factor three were erroneous because he concluded defendant was "running the show" when he committed his offenses and did not consider the effects of peer pressure on defendant committing his crimes. The expert testimony adduced at trial showed defendant succumbed to peer pressure to gain the respect of his peers, and defendant testified he was scared and "following orders" when he shot one of the victims. The judge also ignored the fact Beltran admitted being "the leader of the group . . . the one calling the shots, . . . the one that had the gun, and [the one who] brought it to the scene. He started the violence."

On the issue of planning, amici note that a juvenile's lack of capacity to appreciate the risks and consequences of their actions is not mutually exclusive of their inability to formulate a plan. Rather, it renders them poor at weighing consequences of potential outcomes when formulating their plan.

Defendant argues the sentencing judge should have accorded substantial mitigation under Miller factor four because defendant had failed a competency exam with a score indicating he "had the emotional maturity of a [nine to ten]-year-old" at the age of seventeen. Therefore, the judge's finding that defendant was not impaired by "those qualities of his youth" when he pled guilty was unsupported by the record and contrary to Comer, which held "unless the juvenile himself volunteers privileged information, courts are prohibited from relying upon strategic decisions by counsel for both sides . . . ." 249 N.J. at 407-08.

Indeed, defendant notes his decision to plead guilty was not the best legal decision because it provided no guarantee his sentence would be concurrent, he received the same sentence as Beltran, and he moved to withdraw his plea. Thus, the sentencing judge erroneously relied on the nature of the crime rather than the mitigating qualities of defendant's youth when he concluded "youthfulness [did not] rise to a level that would not make this an offense punishable by life."

A-2359-22

Defendant challenges the sentencing judge's weighing of the aggravating and mitigating factors. He asserts the judge did not explain what evidence he relied on to find he lacked maturity and had not rehabilitated. Further, he argues the judge erred when he found a risk of re-offense under aggravating factor three by disregarding the evidence of his conduct in prison. Aggravating factor nine did not justify the imposition of a life sentence because juveniles are "less likely to take possible punishment into account when making impulsive, ill-considered decisions that stem from immaturity." Comer, 249 N.J. at 399 (citing Roper, 543 U.S. at 571). Therefore, the judge should have applied mitigating factors seven, eight, and nine. N.J.S.A. 2C:44-1(b)(7), (8), and (9).

Defendant argues the sentencing judge was mistaken that Comer only grants relief in terms of the possibility of parole and failed to consider sentencing him to something other than life. He asserts the judge also erred when he found defendant's claims were better heard by a parole board where defendant would have a meaningful opportunity at release. Defendant notes he was later denied parole, given a thirty-six-month future eligibility term, and the parole board found it did not have the authority to modify his sentence. As a result, he has no avenue for relief.

26

## B.

Having considered the arguments raised on appeal pursuant to the legal principles outlined above, we are constrained to conclude the sentencing judge misapplied his discretion because he did not fairly consider defendant's rehabilitation evidence from his multi-decade incarceration. Even though our remand directed the judge to consider "present[ing] up-to-date proofs regarding [defendant's] conduct in the state prison system[,]" Baker, slip op. at 13, the judge seemingly discounted this evidence as unreliable because it occurred while defendant was incarcerated and had "no opportunity to act out." In assessing the first Miller factor, the judge should have accorded defendant's successful and practically flawless prison record the weight it deserved, rather than drawing conclusions about defendant's motives to comply with prison programming that was not supported by the record.

The judge's hesitancy to find defendant had matured based on an instance of animal abuse defendant committed when he was eleven years old ignored the lessons learned from experts and research regarding the age-crime curve explained in Comer. The judge also did not accord sufficient weight to the unrebutted expert testimony defendant adduced showing he possessed "unique matur[ity]." Instead, he focused on the heinous nature of defendant's offense

27

and allowed "the brutal nature of [the] offense . . . [to] overpower mitigating arguments based on youth." Comer, 249 N.J. at 403. This reasoning contradicted Comer's ruling that courts cannot rely on juvenile behavior as evidence they are incapable of maturation as an adult. Id. at 395. The relevant inquiry is the juvenile's "behavior in prison since the time of the offense, among other relevant evidence." Id. at 403.

The sentencing judge erred when in analyzing Miller factor five, he declared "[i]t's almost impossible for [the court] to determine how [defendant is going to] react . . . if [he is] released back into society." This ruling disregarded the psychological evaluations, defendant's prison conduct, and the fact Comer did not hold that the consequences of a juvenile's release control the assessment of this Miller factor.

The judge also did not thoroughly assess defendant's family life and environment under Miller factor two. His conclusion that "[p]eople do[] far less things having far worse childhoods than" defendant's ignored Comer's instruction to "assess a juvenile's individual circumstances . . . ." 249 N.J. at 401.

The judge misapplied his discretion in analyzing Miller factor three to assess if peer pressure impacted defendant within the context of the offense. His

findings convince us he disregarded evidence in the record, including the trial judge's finding that defendant was acting under the influence of peer pressure. The sentencing judge's conclusion defendant was the ringleader of the group directly contradicted Beltran's admission that he was the leader.

We are convinced the factor four <u>Miller</u> findings were erroneous. This factor requires the court to consider defendant's capacity to work within the legal system at the time of the initial plea. The sentencing judge concluded defendant's youth had no impact on his decision to plead guilty, despite defendant's competency examination placing him on the same emotional maturity level as a nine-to-ten-year-old at the time of the plea. The judge focused instead on the gruesome nature of the crime and concluded the factor was inapplicable. This factor warrants reconsideration. The judge must assess whether defendant "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth . . . ." <u>Zuber</u>, 227 N.J. at 445.

C.

It follows from the discussion above that the sentencing judge's analysis of aggravating factors three (likelihood of reoffending) and nine (deterrence); and mitigating factors seven (law-abiding for a substantial period), eight (likelihood of reoffending), and nine (likelihood of reoffending) also constituted

a misapplication of discretion. As we have observed, the judge refused to consider defendant's conduct during incarceration and the evidence of his rehabilitation. This evidence was probative of whether defendant had matured into a law-abiding person. The judge's finding that defendant's decades of good behavior was due to his confinement was based on supposition. Additionally, consideration of the deterrent effect of a life sentence has less application "for juveniles than adults." Comer, 249 N.J. at 399.

D.

The sentencing judge misinterpreted Comer when he concluded the proper forum for defendant to obtain relief was through the parole board. Juvenile offenders are entitled to the reconsideration of their sentences where the court, not the parole board, must balance the Miller factors to determine whether to accord relief. Thomas, 470 N.J. Super. at 201.

E.

For these reasons, we remand for a reconsideration and detailed findings based on the evidence in the record of the Miller factors pursuant to the principles we have outlined from Comer. We also direct the judge handling the remand to reconsider the aggravating and mitigating factors as they apply to defendant's sentence. We express no opinion on the sentencing outcome.

### III.

In Point II, defendant argues we should remand the matter to a different judge. He asserts the sentencing judge made certain remarks that indicated he was committed to his earlier decision. Also, the judge's lack of findings regarding maturation and rehabilitation, and his focus on the heinous nature of the offense showed he did not understand the import of Comer and was pre-disposed to a certain outcome.

It is appropriate to order resentencing before a different judge when the initial judge has shown a commitment to imposing a specific sentence or the "judge expressed comments regarding credibility . . . ." Freedman v. Freedman, 474 N.J. Super. 291, 308 (App. Div. 2023). A defendant does not need to "prove actual prejudice on the part of the court . . . the mere appearance of bias may require disqualification . . . ." State v. McCabe, 201 N.J. 34, 43 (2010) (quoting State v. Marshall, 148 N.J. 89, 279 (1997)). This can be established more easily in instances where the judge has sentenced the defendant multiple times as "[v]iewing the proceedings from the defendant's perspective, it might be difficult to comprehend how the same judge who has twice sentenced him could arrive at a different determination at a third sentencing." State v. Melvin, 248

N.J. 321, 352-53 (2021); see e.g., State v. Kosch, 458 N.J. Super. 344, 355-56 (App. Div. 2019).

We are persuaded the sentencing judge was committed to his findings and did not apply Comer in a fulsome manner as the Court intended. Some of the commentary also gives us pause. Despite the passage of four years since the prior sentencing and a continued unblemished record, the judge said defendant was no different than the defendant "who sat before [him] in 2019." The judge's belief was demonstrated when he declined to consider objective evidence of defendant's rehabilitation and maturation when called upon to apply Comer and the Miller factors. For these reasons, the matter is remanded for a different judge to consider the facts, evidence, and arguments anew.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2359-22